**No. 26-11281**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

CK TRAN,
*Defendant-Appellant*.

On Appeal from the United States District Court
for the Northern District of Alabama
Case No. 4:23-cr-00383-CLM-NAD-8

# APPELLANT'S APPENDIX

LISA M. IVEY
Attorney for CK Tran

STUBBS, SILLS & FRYE, P.C.
1724 South Quintard Avenue
Post Office Box 2023
Anniston, Alabama 36202
(256) 835-5050
lisa@stubbsillsfrye.com

## INDEX OF APPENDIX

**Docket/Tab #**

District Court Docket Sheet……………………………………………………A

Indictment…………………………………………………………..…..……Doc. 1

Plea Agreement……………………………………………………..…...Doc. 179

Defendant's Objection to PSR………………………………..…………Doc. 194

Defendant's Sentencing Memorandum……………….…………………Doc. 247

Notice of Appeal…………………………………………………………Doc. 262

Defendant's Exhibits from Sentencing Hearing…………………….…Doc. 264

PSR………………………………………………………………………Doc. 265

Judgment………………………………………………….……………Doc. 266

Transcript of Sentencing Hearing…………………………………..…Doc. 286

Doc. A

District Court Docket Sheet

APPEAL,PROTECTIVE ORDER

# U.S. District Court
# Northern District of Alabama (Middle)
# CRIMINAL DOCKET FOR CASE #: 4:23-cr-00383-CLM-NAD-8

Case title: USA v. Kaif et al

Date Filed: 10/25/2023

Date Terminated: 04/17/2026

---

Assigned to: Judge Corey L Maze
Referred to: Magistrate Judge Nicholas A Danella

Appeals court case number: 26-11281-G
Eleventh Circuit Court of Appeals

**Defendant (8)**

**CK Chikong Tran**
*TERMINATED: 04/17/2026*
*also known as*
Radiant
*TERMINATED: 04/17/2026*

represented by

**Alison Wallace**
ALISON WALLACE, ATTORNEY AT LAW
P.O.Box 36926
Hoover, AL 35236
205-500-1667
Fax: 205-988-6851
Email: alisonatlaw@gmail.com
*TERMINATED: 05/13/2026*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Lisa Marie Ivey**
STUBBS SILLS & FRYE, PC
1724 South Quintard Avenue
PO Box 2023
Anniston, AL 36202-2023
256-835-5050
Fax: 256-835-0011
Email: lisa@stubbssillsfrye.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

| Pending Counts | Disposition |
|---|---|
| 18:1341,1343, and 1349 FRAUDS AND SWINDLES (1) | CBP 21 mos; SRT 36 mos w/spec conds; No fine; AF $100; TSC by noon on June 8, 2026 to the BOP |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Plaintiff**

**USA** represented by

**Phillip W. Williams Jr., US Attorney**
US ATTORNEY'S OFFICE
1801 4th Avenue North
Birmingham, AL 35203-2101
244-2001
Email: Caseview.ecf@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**US Probation**
UNITED STATES PROBATION OFFICE
Robert Vance Bldg.
1800 5th Avenue North
Birmingham, AL 35203
205-716-2900
Email: alnpdb_cmecf@alnp.uscourts.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**USM**
UNITED STATES MARSHAL
Hugo Black Courthouse, Room 240
1729 5th Avenue North
Birmingham, AL 35203
205-731-1712
Email: usms-aln-courts@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Edward Jonathan Canter**
Litson PLLC
54 Music Square E
Ste 300
Nashville, TN 37203
615-985-8875

Email: ted@litson.co
*TERMINATED: 05/23/2025*
*LEAD ATTORNEY*
*Designation: Retained*

**John Mark Hundscheid**
U.S. ATTORNEY'S OFFICE
200 Davis Circle SW
Suite 300
Huntsville, AL 35801
256-551-7354
Email: john.hundscheid@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Brett Alexander Janich**
United States Attorney's Office for the Northern Distri
1801 Fourth Avenue North
Birmingham, AL 35203
205-244-2156
Email: brett.janich@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/25/2023 | 1 | INDICTMENT as to dfts Aiman Akram Kaif (1) count(s) 1, Damion Wayne Scarlett (2) count(s) 1, Dhruv Gargi (3) count(s) 1, David James Park (4) count(s) 1, Andre Johannes Ischler Simonet (5) count(s) 1, Nicholas John Caruso (6) count(s) 1, Jennifer Mireya Palma (7) count(s) 1. **Please file all subsequent documents using the criminal case number assigned to this indictment.** (Attachments: # 1 (SEALED) Signed Indictment) (KBB) (Entered: 10/26/2023) |
| 10/25/2023 | 2 | MOTION to Seal Indictment filed by USA as to dfts Aiman Akram Kaif, Damion Wayne Scarlett, Dhruv Gargi, David James Park, Andre Johannes Ischler Simonet, Nicholas John Caruso, Jennifer Mireya Palma, CK Chikong Tran, Tyree Samuel Tinsley. (KBB) (Entered: 10/26/2023) |
| 10/25/2023 | 3 | ORDER granting 2 Motion to Seal Indictment as to dfts Aiman Akram Kaif (1), Damion Wayne Scarlett (2), Dhruv Gargi (3), David James Park (4), Andre Johannes Ischler Simonet (5), Nicholas John Caruso (6), Jennifer Mireya Palma (7), CK Chikong Tran (8), Tyree Samuel Tinsley (9). Signed by Magistrate Judge John H England, III on 10/25/2023. (KBB) (Entered: 10/26/2023) |
| 10/25/2023 | | Counts added: CK Chikong Tran (8) count(s) 1, Tyree Samuel Tinsley (9) count(s) 1 (KBB) (Entered: 11/06/2023) |
| 11/06/2023 | 4 | MOTION to Provide Redacted Indictment filed by USA as to dfts Aiman Akram Kaif, Damion Wayne Scarlett, Dhruv Gargi, David James Park, Andre Johannes Ischler Simonet, Nicholas John Caruso, Jennifer Mireya Palma, CK Chikong Tran, Tyree Samuel Tinsley. (KBB) (Entered: 11/06/2023) |
| 11/06/2023 | 5 | ORDER granting 4 Motion to Provide Redacted Indictment as to dft Aiman Akram Kaif (1), Damion Wayne Scarlett (2), Dhruv Gargi (3), David James Park (4), Andre Johannes |

| | | |
|---|---|---|
| | | Ischler Simonet (5), Nicholas John Caruso (6), Jennifer Mireya Palma (7), CK Chikong Tran (8), Tyree Samuel Tinsley (9); Upon the arrest of a dft the Government shall provide to the Court an Indictment that redacts references to defendants who have yet to be arrested. The Clerk's Office shall transmit the redacted indictment to the district where the arrest occurred and place it on this case's docket. The case shall remain sealed until further order by the Court. The USA is **DIRECTED** to inform the Court when the case no longer is required to be sealed for officer safety. Signed by Judge Corey L Maze on 11/6/2023. (cm USA) (KBB) (Entered: 11/06/2023) |
| 11/08/2023 | | Arrest of CK Chikong Tran in New York/Southern District. (KWC, ) (Entered: 11/21/2023) |
| 11/21/2023 | 9 | Rule 5(c)(3) Documents Received form New York/Southern District as to CK Chikong Tran: 11/8/2023 dft arrested; FBI Affidavit filed; CJA 23 filed; CJA atty appointed; IA held; bond hrg held; dft released on $50,000 appearance bond co-signed; ID hrg waived. (Attachments: # 1 Sealed CJA 23, # 2 Sealed Bond)(KWC, ) (Entered: 11/21/2023) |
| 12/04/2023 | 13 | MOTION to Unseal Indictment filed by USA as to dfts Aiman Akram Kaif, Damion Wayne Scarlett, Dhruv Gargi, David James Park, Andre Johannes Ischler Simonet, Nicholas John Caruso, Jennifer Mireya Palma, CK Chikong Tran, Tyree Samuel Tinsley. (KBB) (Entered: 12/04/2023) |
| 12/04/2023 | 14 | ORDER granting 13 Motion to Unseal Case as to dfts Aiman Akram Kaif (1), Damion Wayne Scarlett (2), Dhruv Gargi (3), David James Park (4), Andre Johannes Ischler Simonet (5), Nicholas John Caruso (6), Jennifer Mireya Palma (7), CK Chikong Tran (8), Tyree Samuel Tinsley (9); The Clerk's Office is **DIRECTED** to unseal the Indictment and accompanying documents in this case. All documents containing personal identifying information and financial information SHALL remain under seal. Signed by Judge Corey L Maze on 12/4/2023. (KBB) (Entered: 12/05/2023) |
| 12/05/2023 | | Case as to dfts Aiman Akram Kaif, Damion Wayne Scarlett, Dhruv Gargi, David James Park, Andre Johannes Ischler Simonet, Nicholas John Caruso, Jennifer Mireya Palma, CK Chikong Tran, Tyree Samuel Tinsley Reassigned to Judge Magistrate Judge Nicholas A Danella. Judge Magistrate Judge John H England, III no longer assigned to the case. (KBB) (Entered: 12/05/2023) |
| 12/05/2023 | 15 | TEXT ORDER as to dfts Aiman Akram Kaif, Damion Wayne Scarlett, Dhruv Gargi, David James Park, Andre Johannes Ischler Simonet, CK Chikong Tran, Tyree Samuel Tinsley: Setting Arraignment for **Thursday, 12/14/2023, at 9:30 AM**, in Courtroom 3B of the Hugo L Black US Courthouse, Birmingham, AL before Magistrate Judge Nicholas A Danella. Signed by Magistrate Judge Nicholas A Danella on 12/5/2023. (KBB) (Entered: 12/05/2023) |
| 12/06/2023 | 24 | TEXT ORDER as to CK Chikong Tran: Arraignment is RESET for Tuesday, 1/16/2024 at 10:00 AM in Hugo L Black US Courthouse, Birmingham, AL before Magistrate Judge Nicholas A. Danella. Signed by Magistrate Judge Nicholas A. Danella on 12/6/2023. (SRD) (Entered: 12/06/2023) |
| 12/12/2023 | 38 | TEXT ORDER APPOINTING CJA COUNSEL as to CK Chikong Tran. Alison Wallace appointed for CK Chikong Tran. Signed by Magistrate Judge Nicholas A. Danella on 12/12/2023. (SRD) (Entered: 12/12/2023) |
| 12/22/2023 | 54 | MOTION for Protective Order by USA as to Aiman Akram Kaif, Damion Wayne Scarlett, Dhruv Gargi, David James Park, Andre Johannes Ischler Simonet, Nicholas John Caruso, Jennifer Mireya Palma, CK Chikong Tran, Tyree Samuel Tinsley. (Attachments: # 1 Text of Proposed Order)(Hundscheid, John) (Entered: 12/22/2023) |

| | | |
|---|---|---|
| 12/22/2023 | 55 | MOTION to Unseal Document *(Search Warrant Applications and Affidavits)* by USA as to Aiman Akram Kaif, Damion Wayne Scarlett, Dhruv Gargi, David James Park, Andre Johannes Ischler Simonet, Nicholas John Caruso, Jennifer Mireya Palma, CK Chikong Tran, Tyree Samuel Tinsley. (Attachments: # 1 Text of Proposed Order)(Hundscheid, John) (Entered: 12/22/2023) |
| 12/27/2023 | 56 | PROTECTIVE ORDER granting 54 Motion for Protective Order as to dfts Aiman Akram Kaif (1), Damion Wayne Scarlett (2), Dhruv Gargi (3), David James Park (4), Andre Johannes Ischler Simonet (5), Nicholas John Caruso (6), Jennifer Mireya Palma (7), CK Chikong Tran (8), Tyree Samuel Tinsley (9); That certain documents and information shall remain confidential as set out in this order. Signed by Magistrate Judge Nicholas A Danella on 12/27/2023. (KBB) (Entered: 12/27/2023) |
| 12/28/2023 | 57 | ORDER as to Aiman Akram Kaif (1), Damion Wayne Scarlett (2), Dhruv Gargi (3), David James Park (4), Andre Johannes Ischler Simonet (5), Nicholas John Caruso (6), Jennifer Mireya Palma (7), CK Chikong Tran (8), Tyree Samuel Tinsley (9): This matter is before the Court on the United States' motion to unseal for discovery purposes applications and affidavit for a search warrants (5:22-mj-1024-HNJ, 5:22-mj-1096-HNJ, 5:22-mj-1163-HNJ, and 5:23-mj-1055-HNJ) related to this case. For good cause shown, the Court GRANTS the motion and ORDERS that the application and affidavit for a search warrant and applications and affidavit for seizure warrants in these matters are unsealed for the limited purpose of allowing the United States to disclose them to defense counsel in this case under the Courts Protective Order. Signed by Magistrate Judge Nicholas A Danella on 12/28/2023. (KWC, ) (Entered: 12/28/2023) |
| 01/04/2024 | 64 | RESPONSE to Motion by USA as to Aiman Akram Kaif, Damion Wayne Scarlett, Dhruv Gargi, David James Park, Andre Johannes Ischler Simonet, Nicholas John Caruso, Jennifer Mireya Palma, CK Chikong Tran, Tyree Samuel Tinsley re 61 MOTION Declare Case as Complex (Hundscheid, John) (Entered: 01/04/2024) |
| 01/06/2024 | 68 | NOTICE OF ATTORNEY APPEARANCE: Alison Wallace appearing for CK Chikong Tran (Wallace, Alison) (Entered: 01/06/2024) |
| 01/06/2024 | 69 | MOTION FOR VIRTUAL ARRAIGNMENT by CK Chikong Tran. (Wallace, Alison) Modified on 1/8/2024 (KBB). (Entered: 01/06/2024) |
| 01/08/2024 | 71 | TEXT ORDER granting 69 MOTION for virtual arraignment as to CK Chikong Tran. Arraignment, which was previously set for Tuesday 1/16/2024 at 10:00 AM in Hugo L. Black Courthouse, is RESET and will now take place on **Tuesday 1/16/2024 at 10:30 AM.** This hearing will be conducted virtually by Zoom. Information for joining the virtual hearing will be emailed to counsel. Signed by Magistrate Judge Nicholas A. Danella on 1/8/2024. (SRD) (Entered: 01/08/2024) |
| 01/12/2024 | 74 | WAIVER of Speedy Trial by CK Chikong Tran (Wallace, Alison) (Entered: 01/12/2024) |
| 01/16/2024 | | Minute Entry for proceedings held before Magistrate Judge Nicholas A Danella: Initial Appearance & Arraignment as to CK Chikong Tran (8) held on 1/16/2024 as to Count 1 of the Indictment. AUSA Hundscheid present for govt. Dft present and deemed eligible for court appointed counsel, CJA Wallace present and appointed. Dft waives in-person hearing. Charges & rights explained; dft served; waived reading; not guilty plea entered; Brady reminder; dft released on previously imposed bond. Adj. (Court Reporter Carrie M. Robinson.) (SRD) (Entered: 01/16/2024) |
| 01/19/2024 | 89 | SCHEDULING ORDER and NOTICE that certain deadlines and instructions apply as set out as to Damion Wayne Scarlett, Dhruv Gargi, Andre Johannes Ischler Simonet, Nicholas John Caruso, CK Chikong Tran. Signed by Magistrate Judge Nicholas A. Danella on 1/19/2024. (SRD) (Entered: 01/19/2024) |

| | | |
|---|---|---|
| 01/19/2024 | 90 | STANDING DISCOVERY ORDER with instructions and deadlines set out as to Damion Wayne Scarlett, Dhruv Gargi, Andre Johannes Ischler Simonet, Nicholas John Caruso, CK Chikong Tran. Signed by Magistrate Judge Nicholas A. Danella on 1/19/2024. (SRD) (Entered: 01/19/2024) |
| 01/19/2024 | 91 | STANDING BRADY DISCOVERY ORDER as to Damion Wayne Scarlett, Dhruv Gargi, Andre Johannes Ischler Simonet, Nicholas John Caruso, CK Chikong Tran. Signed by Magistrate Judge Nicholas A. Danella on 1/19/2024. (SRD) (Entered: 01/19/2024) |
| 01/22/2024 | 93 | ORDER GRANTING COURT'S OWN MOTION TO CONTINUE as to dft Aiman Akram Kaif (1), CK Chikong Tran (8); With respect to Defendant Kaif and Defendant Tran, the court's own motion to continue is **GRANTED**. For the reasons stated in motions to continue filed by co-Defendants, and based on Defendant Kaifs waiver (Doc. 75 ), and Defendant Trans waiver (Doc.74), the undersigned **FINDS** that the ends of justice served by granting this continuance outweigh the best interest of the public and Defendant in a speedy trial (see 18 U.S.C. § 3161(h) (7)(A)), that this case is so unusual or so complex that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by 18 U.S.C. § 3161 (see 18 U.S.C. § 3161(h) (7)(B)(ii)), and that the failure to grant this continuance would deny Defendant's counsel the reasonable time necessary for effective preparation, taking into account the exercise of due diligence. The time from the date of this order until **April 8, 2024**, is excluded with pretrial deadlines as set out. By separate order, a United States District Judge will set the trial date. Signed by Magistrate Judge Nicholas A Danella on 1/22/2024. (KAB, ) (Entered: 01/22/2024) |
| 02/08/2024 | 104 | TEXT ORDER as to Aiman Akram Kaif, Damion Wayne Scarlett, Dhruv Gargi, David James Park, Andre Johannes Ischler Simonet, Nicholas John Caruso, CK Chikong Tran, and Tyree Samuel Tinsley. Telephone Conference is set for **Monday, March 11, 2024 at 1:30 PM** before Magistrate Judge Nicholas A. Danella. Counsel should call 205-931-0422 and enter phone conference ID 582 531 526# to participate. Signed by Magistrate Judge Nicholas A. Danella on 2/8/2024. (SRD) (Entered: 02/08/2024) |
| 03/08/2024 | 107 | NOTICE *of Parties' Case Status Update in Advance of Telephone Conference* by John Mark Hundscheid (Hundscheid, John) (Entered: 03/08/2024) |
| 03/08/2024 | 111 | TEXT ORDER as to Aiman Akram Kaif, Damion Wayne Scarlett, Dhruv Gargi, David James Park, Andre Johannes Ischler Simonet, Nicholas John Caruso, CK Chikong Tran, Tyree Samuel Tinsley. Telephone Conference, which was previously set for Monday, March 11, 2024 at 1:30 PM, is RESET and will now take place on **Thursday, 3/14/2024 at 2:30 PM** before Magistrate Judge Nicholas A Danella. Counsel should call 205-931-0422 and enter phone conference ID 582 531 526# to participate. Signed by Magistrate Judge Nicholas A. Danella on 3/8/2024. (SRD) (Entered: 03/08/2024) |
| 03/14/2024 | | Minute Entry for proceedings held before Magistrate Judge Nicholas A Danella: Telephone Conference as to Aiman Akram Kaif, Damion Wayne Scarlett, Dhruv Gargi, David James Park, Andre Johannes Ischler Simonet, Nicholas John Caruso, CK Chikong Tran, Tyree Samuel Tinsley held on 3/14/2024; Attorneys Bloomston (for dft Kaif), Spina (for dft Park), Brower (for dft Simonet), Teakell (for dft Caruso), Wallace (for dft Tran); Jones (for dft Tinsley), and Hundscheid (for the gov't). (Court Reporter None.) (SRD) (Entered: 03/14/2024) |
| 03/18/2024 | 113 | ORDER GRANTING DEFENDANTS' MOTIONS TO CONTINUE as to dfts Aiman Akram Kaif, David James Park, Andre Johannes Ischler Simonet, Nicholas John Caruso, CK Chikong Tran, Tyree Samuel Tinsley; On March 14, 2024, the undersigned held a telephone conference with counsel for the government and for the above-named defendants in the above-referenced case. In that telephone conference, counsel for |

| | | |
|---|---|---|
| | | Defendants orally moved for continuances, which were not opposed by government counsel. Defendants' motions to continue are **GRANTED**. For the reasons stated in the telephone conference, the undersigned **FINDS** that the ends of justice served by granting this continuance outweigh the best interest of the public and each of the above-named defendants in a speedy trial, that this case is so unusual or so complex that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by 18 U.S.C. § 3161, and that the failure to grant this continuance would deny each of the above-named defendants' counsel the reasonable time necessary for effective preparation, taking into account the exercise of due diligence. The time from the date of this order until **June 3, 2024**, is excluded with pretrial deadlines as set out. By separate order, a United States District Judge will set the trial date. Signed by Magistrate Judge Nicholas A Danella on 3/18/2024. (KAB) (Entered: 03/18/2024) |
| 05/20/2024 | 126 | MOTION to Continue by CK Chikong Tran. (Attachments: # 1 Supplement)(Wallace, Alison) (Entered: 05/20/2024) |
| 05/28/2024 | 133 | ORDER GRANTING DEFENDANTS MOTIONS TO CONTINUE as to dfts Damion Wayne Scarlett, David James Park, Andre Johannes Ischler Simonet, CK Chikong Tran, re 126 MOTION to Continue, 130 MOTION to Continue *Plea Hearing for 90 days*, 127 Unopposed MOTION for Extension of Time to File *Pre-Trial Motions and Defendant's Waiver of Speedy Trial*, 128 Unopposed MOTION to Continue ; The motions to continue filed by Defendants Scarlett, Park, Simonet, and Tran (Doc. 126 , filed May 20, 2024; Doc. 127 , filed May 20, 2024; Doc. 128 , filed May 21, 2024; Doc. 130 , filed May 22, 2024) are **GRANTED**. The undersigned **FINDS** that the ends of justice served by granting this continuance outweigh the best interest of the public and each of the above-named defendants in a speedy trial (see 18 U.S.C. § 3161(h)(7)(A)), that this case is so unusual or so complex that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by 18 U.S.C. § 3161 (see 18 U.S.C. § 3161(h)(7)(B)(ii)), and that the failure to grant this continuance would deny each of the above-named defendants counsel the reasonable time necessary for effective preparation, taking into account the exercise of due diligence. The time from the date of this order until **September 3, 2024**, is excluded with pretrial deadlines as set out. By separate order, a United States District Judge will set the trial date. Signed by Magistrate Judge Nicholas A Danella on 5/28/2024. (KAB) (Entered: 05/28/2024) |
| 08/29/2024 | 159 | MOTION to Continue by CK Chikong Tran. (Wallace, Alison) (Entered: 08/29/2024) |
| 08/30/2024 | 160 | ORDER GRANTING DEFENDANTS' MOTIONS TO CONTINUE as to dfts David James Park, CK Chikong Tran re 158 Unopposed MOTION to Continue and Defendant's Waiver of Right to Speedy Trial, 159 MOTION to Continue; The motions to continue filed by Defendants Park and Tran (Doc. 158 , filed August 28, 2024; Doc. 159 , filed August 29, 2024) are **GRANTED**. The undersigned **FINDS** that the ends of justice served by granting this continuance outweigh the best interest of the public and each of the above-named defendants in a speedy trial, that this case is so unusual or so complex that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by 18 U.S.C. § 3161, and that the failure to grant this continuance would deny each of the above-named defendants' counsel the reasonable time necessary for effective preparation, taking into account the exercise of due diligence. The time from the date of this order until **November 4, 2024**, is excluded with pretrial deadlines as set out. By separate order, a United States District Judge will set the trial date. Signed by Magistrate Judge Nicholas A Danella on 8/30/2024. (KAB, ) (Entered: 08/30/2024) |
| 10/21/2024 | 179 | PLEA AGREEMENT as to CK Chikong Tran (Hundscheid, John) (Entered: 10/21/2024) |

| | | |
|---|---|---|
| 10/23/2024 | 180 | TEXT ORDER as to CK Chikong Tran Change of Plea Hearing is set for 11/22/2024 at 02:30 PM in US Courthouse, Anniston, AL before Judge Corey L. Maze. Signed by Judge Corey L. Maze on 10/23/2024. (AMC) (Entered: 10/23/2024) |
| 11/19/2024 | 186 | TEXT ORDER as to CK Chikong Tran (CHANGE OF TIME ONLY) Change of Plea Hearing set for 11/22/2024 at 09:30 AM in US Courthouse, Anniston, AL before Judge Corey L. Maze. Signed by Judge Corey L. Maze on 11/19/2024. (AMC) (Entered: 11/19/2024) |
| 11/22/2024 | 188 | GUILTY PLEA ADVICE OF RIGHTS CERTIFICATION by CK Chikong Tran (AMC) (Entered: 11/22/2024) |
| 11/22/2024 | | Minute Entry for proceedings held before Judge Corey L. Maze:Change of Plea Hearing as to CK Chikong Tran (008) held on November 22, 2024. Present: Def, atty A. Wallace, AUSA Hundscheid; Def sworn; Plea entered by CK Chikong Tran- GUILTY as to Count 1; court accepts the same as free & voluntary; Def continued on same bond; ct adj. Sentencing to be set by separate order. (Court Reporter Carrie Robinson.) (AMC) (Entered: 11/22/2024) |
| 11/22/2024 | 189 | ORDER as to CK Chikong Tran Sentencing set for 4/11/2025 at 09:30 AM in US Courthouse, Anniston, AL before Judge Corey L. Maze. Signed by Judge Corey L. Maze on 11/22/2024. (AMC) (Entered: 11/22/2024) |
| 02/12/2025 | 193 | TEXT ORDER as to CK Chikong Tran. Sentencing is continued generally and will be reset by separate order. Signed by Judge Corey L. Maze on 2/12/2025. (AMC) (Entered: 02/12/2025) |
| 03/02/2025 | 194 | OBJECTION TO PRESENTENCE INVESTIGATION REPORT by CK Chikong Tran (Wallace, Alison) (Entered: 03/02/2025) |
| 04/30/2025 | 205 | MOTION to Withdraw as Attorney *for the United States* by Edward J. Canter. by USA as to Aiman Akram Kaif, Damion Wayne Scarlett, Dhruv Gargi, David James Park, Andre Johannes Ischler Simonet, Nicholas John Caruso, Jennifer Mireya Palma, CK Chikong Tran, Tyree Samuel Tinsley. (Canter, Edward) (Entered: 04/30/2025) |
| 05/20/2025 | 208 | NOTICE OF ATTORNEY APPEARANCE Brett Alexander Janich appearing for USA. (Janich, Brett) (Entered: 05/20/2025) |
| 05/23/2025 | 211 | TEXT ORDER GRANTING motion to withdraw as attorney for the United States by Edward J. Canter (doc. 205 ) as to Aiman Akram Kaif, Damion Wayne Scarlett, Dhruv Gargi, David James Park, Andre Johannes Ischler Simonet, Nicholas John Caruso, Jennifer Mireya Palma, CK Chikong Tran, Tyree Samuel Tinsley. The court **DIRECTS** the Clerk of Court to terminate Edward J. Canter as an attorney of record for the Government. Signed by Judge Corey L Maze on 5/23/2025. (KAB) (Entered: 05/23/2025) |
| 05/23/2025 | | Attorney update in case as to Aiman Akram Kaif, Damion Wayne Scarlett, Dhruv Gargi, David James Park, Andre Johannes Ischler Simonet, Nicholas John Caruso, Jennifer Mireya Palma, CK Chikong Tran, Tyree Samuel Tinsley. Attorney Edward Jonathan Canter terminated. (KAB) (Entered: 05/23/2025) |
| 11/20/2025 | 237 | TEXT ORDER as to CK Chikong Tran Sentencing is set for 4/16/2026 at 01:30 PM in US Courthouse, Anniston, AL before Judge Corey L. Maze. Signed by Judge Corey L. Maze on 11/20/2025. (AMC) (Entered: 11/20/2025) |
| 04/06/2026 | 247 | SENTENCING MEMORANDUM by CK Chikong Tran (Wallace, Alison) (Entered: 04/06/2026) |
| 04/09/2026 | 253 | OMNIBUS SENTENCING MEMORANDUM by USA as to Damion Wayne Scarlett, David James Park, Nicholas John Caruso, Jennifer Mireya Palma, CK Chikong Tran, |

| | | |
|---|---|---|
| | | Tyree Samuel Tinsley (Hundscheid, John) Modified on 4/9/2026 (KBB). (Entered: 04/09/2026) |
| 04/14/2026 | 259 | TEXT ORDER as to Damion Wayne Scarlett, David James Park, Nicholas John Caruso, Jennifer Mireya Palma, CK Chikong Tran, Tyree Samuel Tinsley Telephone Conference is set for 4/15/2026 at 09:00 AM before Judge Corey L. Maze. Attorneys to call 205-931-0422 and enter phone conference ID: 200 662 111# to participate. Signed by Judge Corey L. Maze on 4/14/2026. (AMC) (Entered: 04/14/2026) |
| 04/15/2026 | | Minute Entry for proceedings held before Judge Corey L. Maze:Telephone Conference as to Damion Wayne Scarlett, David James Park, Nicholas John Caruso, Jennifer Mireya Palma, CK Chikong Tran, Tyree Samuel Tinsley held on 4/15/2026 (Court Reporter Carrie Robinson.) (AMC) (Entered: 04/15/2026) |
| 04/16/2026 | | Minute Entry for proceedings held before Judge Corey L. Maze: Sentencing held on April 16, 2026 for CK Chikong Tran (008). Present: Def, Def atty Alison Wallace, AUSA John Hundscheid, and USPO Dupuy. Defense, Def, and govt allocution; Court GRANTED oral motion as stated on the record. SENTENCE: CBP of 21 months; SRT of 3 years - special conds as set out; no fine; no restitution; AF of $100; Def to TSP by Noon on 6/8/2026 to facility designated by BOP; ct adj. (Court Reporter Carrie Robinson.) (AMC) (Entered: 04/17/2026) |
| 04/17/2026 | 262 | NOTICE OF APPEAL by CK Chikong Tran (Wallace, Alison) (Entered: 04/17/2026) |
| 04/17/2026 | 263 | MOTION to Withdraw as Attorney by Alison Wallace. by CK Chikong Tran. (Wallace, Alison) (Entered: 04/17/2026) |
| 04/17/2026 | 264 | EXHIBITS admitted 4/16/2026 for Sentencing Hearing by CK Chikong Tran (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I)(AMC) (Entered: 04/17/2026) |
| 04/17/2026 | 265 | PRESENTENCE INVESTIGATION REPORT (Sealed) as to dft CK Chikong Tran (KNS) (KBB, ). (Entered: 04/17/2026) |
| 04/17/2026 | 266 | JUDGMENT as to CK Chikong Tran (8), Count 1, CBP 21 mos; SRT 36 mos w/spec conds; No fine; AF $100; TSC by noon on June 8, 2026 to the BOP. Signed by Judge Corey L Maze on 4/17/2026. (cm financial and FLU) (KNS) (Entered: 04/17/2026) |
| 04/17/2026 | 267 | Sealed Document- SOR as to dft CK Chikong Tran (cm Alison Wallace and USA) (KNS) (Entered: 04/17/2026) |
| 04/17/2026 | 268 | TRANSMITTAL LETTER TO THE 11TH CIRCUIT as to dft CK Chikong Tran re 262 Notice of Appeal - Final Judgment (KNS) (Entered: 04/17/2026) |
| 04/17/2026 | 269 | Transmission of Notice of Appeal and Docket Sheet as to CK Chikong Tran to US Court of Appeals re 262 Notice of Appeal - Final Judgment (KNS) (Entered: 04/17/2026) |
| 04/21/2026 | | USCA Case Number as to CK Chikong Tran 26-11281-G for 262 Notice of Appeal - Final Judgment filed by CK Chikong Tran. (KBB) (Entered: 04/21/2026) |
| 04/21/2026 | 285 | TEXT ORDER as to CK Chikong Tran re 263 Motion to Withdraw as Attorney by Alison Wallace filed by CK Chikong Tran: A Telephone Conference is set for 4/28/2026 at 1:30 PM before Magistrate Judge Nicholas A Danella. The parties are DIRECTED to dial 205-931-0422; conference ID 468 688 416 to participate. Signed by Magistrate Judge Nicholas A Danella on 4/21/26. (MRR, ) (Entered: 04/21/2026) |
| 04/28/2026 | | Minute Entry for proceedings held before Magistrate Judge Nicholas A Danella:Telephone Conference as to CK Chikong Tran held on 4/28/2026: CJA Wallace |

| | | |
|---|---|---|
| | | present; AUSA Hundscheid present (Court Reporter None.) (MRR, ) (Entered: 04/28/2026) |
| 05/01/2026 | 286 | Transcript of Sentencing Hearing filed as to dft CK Chikong Tran for dates of 4/16/2026 before Judge Corey Maze, re 262 Notice of Appeal - Final Judgment Court Reporter/Transcriber Carrie Robinson, Telephone number 205-278-2063. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. a copy can be obtained at https://www.alnd.uscourts.gov/sites/alnd/files/forms/Transcript%20Redaction%20Policy.pdf >See Transcript Redaction Policy Redaction Request due 5/22/2026. Redacted Transcript Deadline set for 6/1/2026. Release of Transcript Restriction set for 7/30/2026. (KBB) (Entered: 05/01/2026) |
| 05/05/2026 | 287 | TEXT ORDER denying without prejudice Attorney Wallace's motion to withdraw 263 (filed April 17, 2026) as to CK Chikong Tran(8). See Doc. 285; minute entry, entered: 04/28/2026. Neither Attorney Wallace--nor the defendant--has shown good cause for the appointment of substitute counsel. Should either Attorney Wallace--or the defendant himself--attempt to make a showing of good cause, the court would consider whether to appoint substitute counsel. See, e.g., United States v. Amede, 977 F.3d 1086, 1106 (2020) ("When the district court has appointed counsel for an indigent criminal defendant, the defendant does not have the right to demand different appointed counsel unless he can show 'good cause.' 'Good cause' exists only where there is a 'fundamental problem, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict.'" (quoting United States v. Joyner, 899 F.3d 1199, 1205 (11th Cir. 2018))). Signed by Magistrate Judge Nicholas A Danella on 05/05/2026.(Danella, Nicholas) (Entered: 05/05/2026) |
| 05/07/2026 | 288 | TRANSCRIPT REQUEST *of sentencing hearing on 4/16/2026 (already on file) and plea hearing on 11/22/2024 - Crt Rptr Carrie Robinson* as to CK Chikong Tran. (Wallace, Alison) Modified on 5/7/2026 (KWC, ). (Entered: 05/07/2026) |
| 05/08/2026 | 289 | MOTION to Withdraw as Attorney by Alison Wallace. by CK Chikong Tran. (Wallace, Alison) (Entered: 05/08/2026) |
| 05/11/2026 | 290 | TEXT ORDER granting Attorney Wallace's motion to withdraw 289 (filed May 8, 2026) as to CK Chikong Tran(8). Attorney Wallace's motion and the defendant's "motion" that was attached (Doc.289 at 3-4) show good cause for the appointment of substitute appellate counsel on account of a complete breakdown in communication. The Clerk's Office is DIRECTED to appoint substitute appellate counsel for the defendant. Attorney Wallace is DIRECTED to transition the case file and coordinate with substitute appellate counsel in order to preserve continuity of continued representation. See also, e.g., United States v. Amede, 977 F.3d 1086, 1106 (2020) ("While the Sixth Amendment guarantees criminal defendants the right to counsel, it does not grant defendants an unqualified right to the counsel of their choice." (citing United States v. Joyner, 899 F.3d 1199, 1205 (11th Cir. 2018))). Signed by Magistrate Judge Nicholas A Danella on 05/11/2026.(Danella, Nicholas) (Entered: 05/11/2026) |
| 05/13/2026 | 291 | TEXT ORDER APPOINTING CJA COUNSEL as to CK Chikong Tran. CJA Lisa M. Ivey appointed as appellate counsel. Signed by Magistrate Judge Nicholas A Danella on 5/13/26. (MRR, ) (Entered: 05/13/2026) |

| | | |
|---|---|---|
| 05/13/2026 | | Attorney update in case as to CK Chikong Tran. Attorney Alison Wallace terminated pursuant to Text Order 290 (MRR, ) (Entered: 05/13/2026) |
| 05/13/2026 | 292 | RESPONSE by CK Chikong Tran (8) re 263 Motion to Withdraw as Attorney by Attorney Alison Wallace. (pro se) (KWC, ) Modified on 5/15/2026 (KWC, ). (Entered: 05/13/2026) |
| 05/14/2026 | 293 | TRANSCRIPT REQUEST PART II - COURT REPORTER ACKNOWLEDGMENT by C. Robinson as to dft CK Chikong Tran for proceedings held on 11/22/2025 and 4/16/2026 before Judge Corey L Maze. (MEB2) (Entered: 05/14/2026) |
| 05/14/2026 | 294 | MOTION for Substitution and Appointment of Appellate Counsel by CK Chikong Tran. (pro se) (KNS) (Entered: 05/15/2026) |
| 05/15/2026 | 295 | MOTION to Extend Voluntary Surrender Date by CK Chikong Tran. (pro se) (KNS) (Entered: 05/18/2026) |
| 05/18/2026 | 296 | TEXT ORDER terminating as moot the pro se document at 294 as to CK Chikong Tran(8). The pro se document is duplicative of the defendant's "motion" that was attached to Attorney Wallace's second motion to withdraw (Doc. 289 at 3-4), which already has been granted. Doc.290. Substitute appellate counsel already has been appointed for the defendant. Signed by Magistrate Judge Nicholas A Danella on 05/18/2026.(Danella, Nicholas) (Entered: 05/18/2026) |
| 05/20/2026 | 297 | TEXT ORDER as to CK Chikong Tran. The court **GRANTS IN PART** and **DENIES IN PART** the motion to extend voluntary surrender date (doc. 295 ). Defendant CK Tran's surrender date is now **noon Eastern Time on June 29, 2026**. Absent evidence of a documented medical condition the court will not extend this deadline again. The court **DIRECTS** the Clerk of Court to send a copy of this order to the United States Marshals Service. Signed by Judge Corey L Maze on 5/20/2026. (cm dft and USM) (KBB) (Entered: 05/20/2026) |
| 05/26/2026 | 298 | Transcript **CHANGE OF PLEA HEARING** filed as to CK Chikong Tran for dates of 11/22/2024 before Judge Corey L Maze, re 262 Notice of Appeal - Final Judgment Court Reporter/Transcriber Carrie M Robinson, Telephone number 205-278-2063. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. a copy can be obtained at https://www.alnd.uscourts.gov/sites/alnd/files/forms/Transcript%20Redaction%20Policy.pdf >See Transcript Redaction Policy Redaction Request due 6/16/2026. Redacted Transcript Deadline set for 6/26/2026. Release of Transcript Restriction set for 8/24/2026. (21 pages)(KWC, ) (Entered: 05/26/2026) |
| 05/26/2026 | 299 | TRANSCRIPT REQUEST PART II. Court Reporter Acknowledgment by nCrtRptr Carrie M Robinson as to CK Chikong Tran (8) for proceedings held on 11/22/2024 before Judge Corey L Maze. (KWC, ) (Entered: 05/26/2026) |
| 05/27/2026 | 300 | TRANSCRIPT REQUEST PART III NOTIFICATION THAT TRANSCRIPT HAS BEEN FILED IN DISTRICT COURT filed by C. Robinson as to dft CK Chikong Tran for proceedings held on 11/22/25 and 4/16/26 before Judge Corey Maze. (KBB) (Entered: 05/27/2026) |

| | | |
|---|---|---|
| 06/19/2026 | 301 | MOTION FOR RELEASE PENDING APPEAL AND TO STAY EXECUTION OF SENTENCE PENDING APPEAL by CK Chikong Tran. (Ivey, Lisa) Modified on 6/22/2026 (KBB). (Entered: 06/19/2026) |
| 06/25/2026 | 303 | EMERGENCY MOTION for Reconsideration or Clarification of Order Denying Stay of Self-Surrender Pending Appeal, and Alternative Motion for Temporary Administrative Stay filed by CK Chikong Tran (pro se). (Attachments: # 1 Exhibit A-H, # 2 Exhibit I-K) (KBB) (Entered: 06/25/2026) |
| 06/26/2026 | 304 | TEXT ORDER as to CK Chikong Tran Telephone Conference is set for 6/26/2026 at 01:00 PM before Judge Corey L. Maze. Parties call 205-931-0422 and enter Phone conference ID: 440 109 029# to participate. Signed by Judge Corey L. Maze on 6/26/2026. (AMC) (Entered: 06/26/2026) |
| 06/26/2026 | 305 | ORDER as to dft CK Chikong Tran (8) re 303 Motion for Reconsideration or clarification of order denying stay of self-surrender pending appeal and alternative motion for temporary administrative stay; For the reasons stated in the court's previous order (doc. 302 ), the court **DENIES** Tran's motion to stay the execution of his sentence pending appeal. The court also **DENIES** Tran's motion because he is represented by counsel and has filed his motion pro se without leave of court. As for Tran's alternative argument that the court should temporarily stay his self-surrender date because he has not been provided with a turn in location. During the June 26, 2026, telephone conference, Tran was informed in late May that he is to turn himself in at FCI Fort Dix Satellite Camp. Thus, the court **DENIES** Tran's request for a temporary stay.The court **REMINDS** Tran that his self-surrender date is noon local time on June 29, 2026. So Tran must self-surrender at FCI Fort Dix Satellite Camp, 5756 Hartford &, N. Pointville Road, Fort Dix, NJ 08640 at **12:00 PM Eastern Time on Monday, June 29, 2026**. Signed by Judge Corey L Maze on 6/26/2026. (cm dft and USM) (KBB) (Entered: 06/26/2026) |
| 06/29/2026 | | Minute Entry for proceedings held before Judge Corey L. Maze:Telephone Conference as to CK Chikong Tran held on 6/26/2026 (Court Reporter Carrie Robinson.) (AMC) (Entered: 06/29/2026) |


## PACER Service Center

### Transaction Receipt

09/21/2026 09:17:22

| | | | |
|---|---|---|---|
| **PACER Login:** | li0471x2 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:23-cr-00383-CLM-NAD |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |
| **Exempt flag:** | Not Exempt | **Exempt reason:** | Not Exempt |

Doc. 1
Indictment

FILED
2023 Oct-26 PM 12:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

PFE/JMH/EJC: Nov. 2023
GJ #12

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **AIMAN AKRAM KAIF,** | ) | |
| ***aka* "Dior,"** | ) | |
| **DAMION WAYNE SCARLETT,** | ) | |
| ***aka* "Dash,"** | ) | |
| **DHRUV GARGI,** | ) | |
| ***aka* "Panda,"** | ) | |
| **DAVID JAMES PARK,** | ) | **Case No.** |
| ***aka* "Plutus,"** | ) | |
| **ANDRE JOHANNES ISCHLER** | ) | |
| **SIMONET,** | ) | |
| ***aka* "Chief,"** | ) | |
| **NICHOLAS JOHN CARUSO,** | ) | |
| ***aka* "Deaf,"** | ) | |
| **JENNIFER MIREYA PALMA,** | ) | |
| ***aka* "Bianca,"** | ) | |
| **CK CHIKONG TRAN,** | ) | |
| ***aka* "Radiant," and** | ) | |
| **TYREE SAMUEL TINSLEY,** | ) | |
| ***aka* "Tysamtin,"** | ) | |
| | ) | |
| **Defendants.** | ) | |

**INDICTMENT**

The Grand Jury charges that:

**INTRODUCTION**

At all times material to this Indictment:

1. Telegram was a cloud-based instant messaging service that offered users the ability to send and receive end-to-end encrypted messages. A Telegram channel allowed users to disseminate messages to Telegram users who subscribed to the channel. Each Telegram user had a username, also known as a handle, that identified the user's account. The handle is preceded by an "@" symbol.

2. United Parcel Service ("UPS") and Federal Express ("FedEx") are American private and commercial interstate carriers that ship and receive packages.

3. "Refund fraud" was a fraud by which complicit parties purchased an item, had the purchase refunded, and then, through various means, kept the refunded item for personal use or to sell for profit. Refund fraud included the submission of fraudulent warranty claims to retailers for the purpose of obtaining products. Fraudsters who engage in refund fraud were known as "refunders."

4. "Noir's Organization" was a group organized through Telegram and other internet-based services. Noir's Organization defrauded retailers through online refund fraud. Noir's Organization operated several Telegram channels devoted to refund fraud, including Noir's Luxury Refunds.

5. Noir's Organization operated a "concierge" refund service where it offered refund fraud services to the public through the Noir's Luxury Refunds

Telegram channel. After a customer purchased a product, the customer would contact Noir's Organization to perform a fraudulent refund of the order on the customer's behalf. In exchange for this service, the customer would pay Noir's Organization a portion of the product price.

6. Noir's Organization marketed itself as having the expertise to commit refund fraud against retailers across the world in a wide range of industries. Noir's Organization also marketed itself as having the ability to commit refund fraud and obtain expensive products like computers, iPads, and appliances. Through Noir's Organization's service, customers effectively received a product for a steep discount, Noir's Organization collected a fee, and retailers suffered a loss because they had provided the product to the customer but had ultimately not collected the purchase price.

7. AIMAN AKRAM KAIF was a member of Noir's Organization who used the Telegram handle @Dior. KAIF resided in New York County, New York.

8. DAMIAN WAYNE SCARLETT was a member of Noir's Organization who used the Telegram handle @Dash. SCARLETT resided in Orange County, New York.

9. DHRUV GARGI was a member of Noir's Organization who used the Telegram handle @AncientBananaOld with the display name "Panda." GARGI resided in Essex County, New Jersey.

10. DAVID JAMES PARK was a member of Noir's Organization who used the Telegram handle @Plutus. PARK resided in Maricopa County, Arizona.

11. ANDRE JOHANNES ISCHLER SIMONET was a member of Noir's Organization who used the Telegram handle @Imchief2 with the display name "Chief." SIMONET resided in Rice County, Minnesota.

12. NICHOLAS JOHN CARUSO was a member of Noir's Organization who used the Telegram handle @Deaf. CARUSO resided in Dallas County, Texas.

13. JENNIFER MIREYA PALMA was a member of Noir's Organization who used the Telegram handle @Bianca and @J. PALMA resided in Los Angeles County, California.

14. CK CHIKONG TRAN was a member of Noir's Organization who used the Telegram handle @Radiant. TRAN resided in New York County, New York.

15. TYREE SAMUEL TINSLEY was a member of Noir's Organization who used the Telegram handles @YGOTrader and @Tysamtin. TINSLEY resided in Chesterfield County, Virginia.

16. INDIVIDUAL 1 was a person who resided in the Northern District of Alabama. INDIVIDUAL 1's address in Anniston, Alabama, was used by Noir's Organization to receive products obtained through refund fraud.

**<u>COUNT ONE</u>: [18 U.S.C. §§ 1341, 1343, and 1349]**

17. The allegations in paragraphs 1 through 16 of this Indictment are re-alleged as though fully set forth herein.

18. Beginning in or around July 2020 and continuing until a date unknown but no earlier than on or about July 2022, more exact dates being unknown to the Grand Jury, in Calhoun and Madison counties, within the Northern District of Alabama, and elsewhere, the defendants,

**AIMAN AKRAM KAIF, *aka* "Dior,"**
**DAMION WAYNE SCARLETT, *aka* "Dash,"**
**DHRUV GARGI, *aka* "Panda,"**
**DAVID JAMES PARK, *aka* "Plutus,"**
**ANDRE JOHANNES ISCHLER SIMONET, *aka* "Chief,"**
**NICHOLAS JOHN CARUSO, *aka* "Deaf,"**
**JENNIFER MIREYA PALMA, *aka* "Bianca,"**
**CK CHIKONG TRAN, *aka* "Radiant," and**
**TYREE SAMUEL TINSLEY, *aka* "Tysamtin,"**

knowingly and willfully conspired and agreed with each other and with other persons known and unknown to the Grand Jury, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, and to cause to be delivered by mail and private and commercial interstate carriers according to the direction thereon and at the place at which it was directed to be delivered by the person to whom it was addressed for the purposes of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1341 and 1343.

## OBJECT OF THE CONSPIRACY

19. It was a purpose of the conspiracy for the defendants,

**AIMAN AKRAM KAIF, *aka* "Dior,"**
**DAMION WAYNE SCARLETT, *aka* "Dash,"**
**DHRUV GARGI, *aka* "Panda,"**
**DAVID JAMES PARK, *aka* "Plutus,"**
**ANDRE JOHANNES ISCHLER SIMONET, *aka* "Chief,"**
**NICHOLAS JOHN CARUSO, *aka* "Deaf,"**
**JENNIFER MIREYA PALMA, *aka* "Bianca,"**
**CK CHIKONG TRAN, *aka* "Radiant," and**
**TYREE SAMUEL TINSLEY, *aka* "Tysamtin,"**

and other co-conspirators to unlawfully enrich themselves and others by, among other things, tricking online retailers into issuing refunds and replacement products under false and fraudulent pretenses and through false and fraudulent representations.

## MANNER AND MEANS OF THE CONSPIRACY

20. Among the manner and means used by the conspiracy to achieve its unlawful objects and in furtherance of the scheme were the following:

21. Noir's Organization developed and deployed different methods to conduct refund fraud. Tactics often evolved in response to retailers' changing their refund policies and procedures to counteract fraud. Among the refund fraud methods used by Noir's Organization were the following:

A. "Did Not Arrive (DNA)": Noir's Organization contacted the retailer and claimed that the purchased item was not delivered. The retailer issued a refund in response.

B. "Empty Box Fraud": Noir's Organization contacted the retailer and claimed that a package was delivered by the retailer but that it was empty. The retailer issued a refund in response.

C. "Fake Tracking Identification (FTID)": Noir Organization used manipulated return shipping labels. These manipulated labels would remove identifying customer information, change the shipping address on the label, or both. Through this method, retailers were deceived into believing they had received a return when they had not.

D. "False Warranty Claim": Noir's Organization submitted a warranty claim for a product, fraudulently claiming that it was defective. The retailer shipped a replacement product in response.

E. "Insiders": Noir's Organization recruited retailer customer service employees to process fraudulent refunds on behalf of the conspiracy.

F. "Double Dips": Noir's Organization would attempt to have a second item as a replacement for the initially purchased item, effectively giving the refunder two items to keep or sell rather than one.

22. Noir's Luxury Refunds customers would purchase items and then have Noir's Organization refund it using false and fraudulent pretenses and representations to the retailer. In exchange for conducting the fraudulent refund on behalf of the purchaser, the customer paid a portion of the purchase price to Noir's Organization as a fee.

23. At one point, Noir's Organization would take refund orders using Google Forms and track them using Google Sheets. These documents reflect that

Noir's Organization refunded or attempted to refund millions of dollars' worth of products, including electronics, designer clothing and apparel, as well as home furnishings and appliances.

24. Noir's Organization would also obtain retail products through refund fraud and then sell or attempt to sell them on markets like eBay and in bulk to wholesale resale services.

25. Noir's Organization established storage and reshipping locations throughout the United States to facilitate the conspiracy's resale operation. Noir's Organization would send products obtained through refund fraud to these addresses and then would have them forwarded to other members of the organization.

26. On one occasion, Noir's Organization obtained IronWolf 18TB hard drives from Seagate through refund fraud. Seagate shipped the hard drives from California to INDIVIDUAL 1's address in Anniston, Alabama, through UPS on January 25, 2022.

27. On one occasion, Noir's Organization obtained a Hewlitt Packard STP 651 printer through refund fraud. Hewlitt Packard shipped the printer from California to INDIVIDUAL 1's address in Anniston, Alabama, through UPS on January 26, 2022.

28. Once items were received at INDIVIDUAL 1's address, Noir's Organization had them shipped to TINSLEY's residence in Richmond, Virginia, through FedEx.

All in violation of Title 18, United States Code, Section 1349.

**NOTICE OF FORFEITURE**
**[18 U.S.C. §§ 981(a)(1)(C), 982(a)(2)(A), and 28 U.S.C. § 2461(c)]**

29. The factual allegations contained in paragraph 1 through 28 of this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(A), and Title 28, United States Code, Section 2461(c).

30. Upon conviction of the offenses in violation of Title 18, United States Code, Section 1349, set forth in Count One of this Indictment, the defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(A), and Title 28, United States Code, Section 2461(c), any and all property constituting, or derived from, proceeds the defendants obtained directly or indirectly, as a result of the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

31. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;
c. has been placed beyond the jurisdiction of the court;
d. has been substantially diminished in value; or
e. has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL

*/s/ Electronic Signature*
FOREPERSON OF THE GRAND JURY

PRIM F. ESCALONA
United States Attorney

*/s/ Electronic Signature*

JOHN M. HUNDSCHEID
Assistant United States Attorney

*/s/ Electronic Signature*

EDWARD J. CANTER
Assistant United States Attorney

Doc. 179
Plea Agreement

FILED
2024 Oct-21 AM 09:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CK CHIKONG TRAN,** | ) | **Case No. 4:23-cr-00383-CLM-NAD** |
| ***aka* "Radiant,"** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLEA AGREEMENT

The Government and the defendant, CK CHIKONG TRAN, hereby acknowledge the following plea agreement in this case:

## PLEA

The defendant agrees to (i) plead guilty to Count One of the Indictment filed in the above-numbered-and-captioned matter; (ii) pay restitution as ordered by the Court; and (iii) waive certain rights to direct appeal and collateral attack as outlined in Section IV of this agreement. In exchange, the United States Attorney, acting on behalf of the Government and through the undersigned Assistant United States Attorney, agrees to recommend the disposition specified below, subject to the conditions in Section VII.

 Defendant's Initials CKT

## TERMS OF THE AGREEMENT

### I. MAXIMUM PUNISHMENT

The defendant understands that the maximum statutory punishment that may be imposed for Conspiracy to Commit Mail Fraud and Wire Fraud, in violation of Title 18, United States Code, Section 1349, as charged in Count One, is:

A. Imprisonment for not more than 20 years;

B. A fine of not more than $250,000, or,

C. Both A and B;

D. Supervised release of not more than 3 years; and

E. A special assessment of $100.

### II. FACTUAL BASIS FOR PLEA

The Government is prepared to prove, at a minimum, the following facts at the trial of this case:

In November 2021, the FBI began investigating a Telegram channel named "Noir's Luxury Refunds." The channel's operators advertised their ability to obtain products from retailers through "refund fraud." Refund fraud is where complicit parties purchase an item, have the purchase refunded, and then, through various means, keep the refunded item for personal use or to sell for profit. Fraudsters who engage in refund fraud are colloquially known as "refunders." Refunders use a variety of methods to defraud retailers, including the following tactics, which are often used in combination:

- "Did Not Arrive (DNA)": the fraudster will contact the retailer and claim that the purchased item was not delivered. The retailer will issue a refund, and the fraudster will keep the product.

 Defendant's Initials CKT

- "Mail-Ins / Empty Box Fraud": the fraudster will initiate a return and then mail an empty box or a box containing trash back to the retailer. Many retailers initiate a refund when they are notified that a product is being shipped back.

- "False Warranty Claim": a refunder will submit a warranty claim for a product, fraudulently claiming that it is defective. The retailer will then ship a replacement product to the refunder.

- "Insiders": refunders recruit retailer customer service employees to process refunds on behalf of the fraudsters.

- "Fake Tracking Identification (FTID)": when a product return is initiated, many retailers mail customers shipping labels to facilitate shipping the product back. The fraudster will manipulate the provided label, changing the address to another location within the same ZIP code. The return will show in the courier's tracking system as delivered, but the retailer will not receive a package. The fraudster may also remove identifying customer information from the label, preventing the retailer from identifying who sent back a package that did not contain an item.

- "Double Dips": refunders will sometimes attempt to have a second item as a replacement for the initially purchased item, effectively giving the refunder two items to keep or sell rather than one.

Tactics are often altered to counteract a retailer's security policies. For instance, in response to DNA fraud, retailers began having package carriers take pictures of boxes after they were delivered. Refunders responded by switching tactics and adopting empty box fraud. Retailers then would back bill customers who returned a box that did not contain the purchased item. Refunders then deployed FTIDs and fake tracking scans to deceive retailers into believing they had received the returned item.

 Defendant's Initials CKT

A. Noir's Organization

The FBI's investigation determined that Noir's Luxury Refunds was created by the Telegram user "Noir," who used various handles over time including @Noircorp and @Realnoir. Through Telegram, Noir organized a conspiracy ("Noir's Organization") devoted to refund fraud. Noir's Organization operated several Telegram channels devoted to fraud. It opened the Noir's Luxury Refund channel on or about July 20, 2020. Through aggressive advertising, the channel amassed a following of over 5,900 accounts. Noir's Organization also operated the website noirse.com, where it advertised its ability to refund retailers.

Noir's Organization operated several different fraud enterprises, all of which were centered on refund fraud. It offered to refund products on behalf of the public for a fee through its "concierge" refund service. The organization also acquired products through fraud for itself to sell online. At one point, Noir's Organization also offered a travel service that would place fraudulent bookings for flights and hotels. In addition, Noir's Organization offered a mentorship program where aspiring refunders could pay a fee to learn how to commit refund fraud.

To insulate themselves from the fraud, Noir's Organization members would create operational Google accounts containing minimal identifying information. Conspirators would use these accounts to place fraudulent refund orders or host and edit collaborative documents for Noir's Organization. Members of Noir's Organization also often used proxy server services and Virtual Private Network services to mask their IP addresses. Members of Noir's Organization were located across the world.

1. The Concierge Refund Service

From approximately July 20, 2020, until June 1, 2022, Noir's Organization operated a concierge refund service. Members of the public would pay Noir's Organization a fee in exchange for it performing a fraudulent online refund on the customer's behalf. The fee depended on the retailer defrauded and typically ranged from 20% to 30% of the product price. The Noir Organization refunder personally received 6% to 8% of the total refund order. Noir's Organization primarily operated the refund service through the Noir's Luxury Refunds Telegram channel. At its peak, the channel had over 8,000 members.



Defendant's Initials CKT

---

Noir's Organization advertised its ability to refund a large swath of companies, including electronics retailers and designer fashion brands. Below is a screenshot from a Google Sheet named "Noir Enterprises Store List" depicting some of the electronics retailers targeted by Noir's Organization that was hosted in a conspirator's Google Account:

**NOIR'S USA *REFUNDABLE STORE LIST***

We Lead, They Follow.

*FREQUENTLY ASKED QUESTIONS*

How long does it take to get my refund? This varies depending on the store and season. Ideally in as little as 3 days but it can take several weeks

How much does it cost? Our standard fee is 20-25%

When is payment due? Payment is due immediately on refund confirmation. Non payment will result in the order being rebilled and authorities notified

How do I pay? We support virtually every payment method from Crypto to Paypal, Venmo and Cashapp

Who do I contact for questions? Please reach out to @[illegible] for order updates, confirmations or general questions

Minimum Order Size: $1000. This must be a single order, multiple orders cannot be combined into one

What does "Instant" mean? It means we can initiate the refund immediately without a waiting period or expect a lengthy investigation process. It can still take upwards of 7 days

ELECTRONICS

| Store | $ Limit | Item Limit | Timeframe | Fee | Notes |
|---|---|---|---|---|---|
| Apple ☆ | No Limit | 1 Item | Instant | 25% | Replacements Only. Refund the replacement item |
| Amazon ☆ (Aged) | $15,000 | 5 Items | 2-3 Weeks | 20% | Aged Account Limits. Items must be returnable |
| Amazon ☆ (New) | $5,000 | 5 Items | 2-3 Weeks | 20% | New Account Limit. Items must be returnable |
| Costco | $5,000 | 5 Items | 2-5 Days | 25% | |
| Lenovo | $5,000 | 1 Item | Instant | 25% | Double Dip Available |
| Dell | $3,000 | 1 Item | 2-3 Weeks | 20% | |
| HP ☆ | $5,000 | 1 Item | 2-3 Weeks | 20% | |
| Ring.com | $2,000 | 10 Items | 3-5 Days | 25% | |
| Microsoft Store | $5,000 | 5 Items | 3-5 Days | 25% | |
| Google ☆ | $5,000 | 5 Items | 3-5 Days | 25% | |
| Shark Clean | $5,000 | 10 Items | 1-3 Days | 25% | |
| [illegible].com | $3,000 | 20 Items | Instant | 25% | |

*Figure 1: Screenshots of Portions of Noir's Refundable Store List*

At one point, Noir's Organization received orders for its refund service through Google Forms. Users would provide information about their requested refund to Noir's Organization through the forms, including their Telegram handle, how the customer would pay for the refund, whether the customer wanted Noir's Organization to attempt a double dip, and the customer's account information and password for the retailer's website. The customer also conveyed to Noir's Organization when and how the product was delivered. This information allowed Noir's Organization to assess which refund fraud methods might be effective.



Defendant's Initials CKT

On December 13th, we've released a new form, and introduced a better team structure & a ticket system built-in

Form:

— IF You have submitted the older form prior to December 13th, MAKE SURE You fill out the new one to ensure your order is order is done as soon as possible

— We start all orders same-day.

— The new form is easy to fill, and asks for less sensitive information.

Thank you for your contentious trust towards our services

Google Docs
Noir's Luxury Refunds
When you have received delivery of your order, please fill out the below form in its entirety.
Please give as much detail as possible to preven...

*Figure 2: Google Form Posted in Noir's Luxury Refunds*

Noir's Organization would then assign a team member to refund the order. Often, the refunder would start by doing a "chat-in" or "call-in" to a retailer customer service representative. According to a conspiracy member interviewed as part of the investigation, it usually took about two weeks to find the right customer service representative to issue the refund. The precise method of refunding was always retailer specific. Noir's Organization developed many refund fraud methods (most of which involved false shipment tracking scans) that resulted in "instant" refunds, meaning that there was little-to-no delay between a refund claim being submitted and it being processed and paid out.



Defendant's Initials CKT

Noir's Organization also used malware and bots to facilitate refund fraud. DHRUV GARGI (who used the Telegram persona "Panda"), for instance, developed a piece of malware for Noir's Organization that targeted Costco, Home Depot, and Wayfair's websites and allowed items the retailers had set in their website's code not to be returnable through an online transaction to be returnable. Noir's Organization paid GARGI $3,000 for the malware.

Customers would usually pay Noir's Organization for their refund through cryptocurrency, but other payment methods were also accepted. Noir's Organization acquired "burner" CashApp accounts by paying for a Credit Privacy Number ("CPN") for a few hundred dollars.[1] This allowed Noir's Organization to satisfy CashApp's know-your-customer verification process without having to associate a conspirator's identity with the account.

The information collected through the Google Forms was stored on Google Sheets. Google Sheets are located on the Google Drive of the hosting account. Over the course of the investigation, search warrants for Google Accounts associated with the conspiracy revealed several "order sheets" for Noir's Organization. Eventually, Noir's Organization migrated its refund order processing and tracking to ClickUp, a cloud-based project management tool.

2. The Resale Operation

Noir's Organization also acquired inventory through what it called a "trade for trade" mechanism. If Noir's Organization could execute a double dip on behalf of the customer purchasing a refund, the customer could provide that second item to Noir's Organization rather than paying the refund fee. This allowed Noir's Organization to acquire inventory without first expending capital as the refund service customer was the person making the initial purchase.

This process evolved into a resale operation. In addition to the concierge refund service, Noir's Organization obtained products for itself through refund fraud. It would then sell the products on online markets like eBay and in bulk to whole resale services. Retailers have anti-fraud measures designed to identify refund requests that are likely to be fraudulent. If an identifier like an email, IP address,

[1] A CPN is a nine-digit number that is formulated like a Social Security Number ("SSN"). Although the Social Security Administration will assign a new SSN in certain limited circumstances, most "CPNs" are in fact SSNs belonging to children, inmates, or deceased individuals.

 Defendant's Initials CKT

payment mechanism, or mailing address is associated with a high volume of refund requests or previous fraud, the retailer will blacklist it. To circumvent these mechanisms, Noir's Organization recruited individuals to purchase items that could be refunded and then shipped to a storage location. The recruited individuals would also purchase the product with their own funds, obviating the need for Noir's Organization to expend significant capital to acquire inventory.

Project Alpha, Project Charlie, and Project Tango were Noir's Organization initiatives to recruit members to purchase items for the resale operation. In exchange for their participation in the project, Noir's Organization would assist the volunteer with refunding an item he or she would keep. In a conspirator's email account, agents discovered a draft of an introduction message for Project Alpha that could be copied into Telegram or another messaging service:

> Alright, you've been accepted!
>
> Welcome to Project Alpha. Using our extensive list of private stores and methods, we will help you earn around $10,000 per month.
>
> Everyone will be divided into groups. Each is given instructions on which store to order from and what products to buy. We will rotate the stores to avoid saturation and keep things moving, so everyone can earn money.
>
> Before placing your order, you will receive a list of items we need. When the order has been completed and refunded, you will receive instructions on how to ship the items to Noir Enterprises. Following this, you will be rotated to the next store to place an order for yourself, which you get to keep or resell as you please. As long as you follow the instructions you receive from the team, it should be a simple and straightforward process.
>
> Any questions? Drop them in here and I will answer them. If not, you will hear from dash or myself shortly regard your store assignment.

 Defendant's Initials CKT

Noir's Organization also developed Project Virtual, which was another initiative that aimed to obtain an inventory of refunded products for the group. The project began around April 2022. Project Virtual' s goal was to create corporate entities using fictitious or fraudulent identifiers, and then develop credit tradelines for the companies. Noir's Organization planned to use the entities' credit to purchase items through virtual credit cards ("VCCs") and then refund them.[2] Part of the goal of Project Virtual was to identify VCC services that used US-based Bank Identification Numbers ("BINs")[3] because many American retailers do not permit online purchases from payment instruments with foreign BINs.

In the Project Virtual chat, Noir outlined the plan for the initiative:

Stage 1:
— Acquiring List of HQ VCCs [No Privacy, or EMI] VCCs must be unraped and preferably newly launched ones
Researching BINs [No VISA/Debit BINs]
Stage 2:
— Finding the best plugs for Scans/KYC Verification
— 2-3 People will setup VCC Accounts for everyone [Those who've been assigned that task, or do it yourself]
— Figuring out the best OPSEC Friendly way to move transfers in and out of VCCs [For example, Wise.com can be paired with LocalCrypto.com to move BTC in and Out with ease through P2P]
Stage 3:
— Preparing a list of the BEST Instant/Semi Instant stores to hit
— We will use current & updated list, which will be updated by our refund team
— The Acquirement of un-fucked drops for Refunds [WILL BE THE MOST CHALLENGING PART, WE MUST FIGURE OUT A SEPARATESTAGE PLAN FOR THIS]
Stage 4:
— We'll utilize Mario's knowledge in Proxies, Auto-Checkout, Scalping, to our advantage in this refund adventure

[2] Virtual credit cards are unique credit card numbers that allow you to transact on your main credit card account without exposing your account number.
[3] A BIN refers to the first four to six numbers on a payment card, which identifies the financial institution that issues the card.

 Defendant's Initials CKT

— Olivander, Waynor, etc place orders for us through the VCCs using the most optimal setup for bypassing cancellations, will be advised for by Mario
— Refund it: Orders must be started as TOP Priority [Above VIP/Alpha]
Stage 5:
— Waynor will audit everything and help us collect well-rounded data for scale
— Project's estimated to generate a lot of income for everyone involved by May

Noir's Organization also exploited retailers' warranty policies. Conspirators would submit fraudulent warranty claims to retailers and obtain replacement products. It is not known how Noir's Organization obtained legitimate product serial numbers to submit warranty claims. Based on the number of items for which claims were submitted, it is unlikely that Noir's Organization possessed the item with the serial numbers for which they were submitting claims.

Noir's Organization maintained storage locations for the items it obtained through refund fraud. One of the locations was the residence at TYREE TINSLEY's (who used the Telegram handle "Tysamtin") residence in Richmond, Virginia. A shipping label with that address was attached to a Noir Organization Google Form. The form instructed users to "[s]end packages to" the address. In other Noir's Organization documents, the address is associated with the Telegram user @Tysamtin. A Google Form titled "Project Alpha Charlie Tango" had instructions to "[p]lease send the tracking number and courier name to @Tysamtin." From this location, as well as other storage locations, Noir's Organization would ship products obtained through refund fraud it had sold on secondary marketplaces.

Noir's Organization used an address in Anniston, Alabama, to receive products obtained through refund fraud. Spreadsheets found in a conspirator's Google Account that were used to track drop addresses and refund orders contained the Anniston address along with the name of a person who lives in the Northern District of Alabama.

One of these spreadsheets had three refund orders associated with the Anniston address. The products were an HP STP 651 printer and two sets of two (four total) Seagate IronWolf 18TB hard drives. For each product, the spreadsheet listed a "Recipient's name," which is believed to be an alias, the shipping tracking

 Defendant's Initials CKT

number, serial number, and the status of the refund (e.g., "Label sent," "Logged w/delivery"). Records from UPS confirm that the Seagate packages addressed to the alias names in the spreadsheet were shipped from the retailer in California to the Anniston address on January 25, 2022, and January 28, 2022.

On May 27, 2022, the FBI purchased a Dell Ultrasharp 4K USB-C Monitor printer from an eBay account that the investigation determined was associated with Noir's Organization. On June 6, 2022, the package was delivered by the United States Postal Service in Huntsville, Alabama. Tracking information for the package indicated that it had been shipped from Las Vegas, Nevada.

On June 6, 2022, the FBI purchased a HP STP 651 printer from the Noir Organization eBay account. On June 10, 2022, a package shipped through FedEx containing the printer was delivered in Huntsville, Alabama. When the FedEx shipping label was removed, a previous UPS shipping label with the Anniston address was discovered underneath. During a search of a conspirator's Google Account, an email from UPS was located with the shipping and tracking information for this same package.

3. The Travel Service

Noir's Organization, led by the user Rateable, also exploited the travel industry through the Telegram channel "Noir's Flight Services." Like with the concierge refund service, customers placed orders through Google Forms. Customers could purchase flights, hotels, and travel packages. The customer would pay Noir's Organization 50% of the price of the package as reflected on Expedia. Until February 16, 2022, the channel was known by various iterations of the name "Rateables Flight Service Channel" including "Rateables Flight Services Presented by Noir Enterprises." On February 20, 2022, Noir's Organization took full control of the travel services offered in the channel and it was rebranded as "Noir's Flight Service".

Noir's Organization predominately used two methods to fraudulently book travel arrangements. First, Rateable obtained logins to airline employees' "D3" or "D7" list, which is a list of persons associated with the employee who were permitted to travel for free on the airline. Rateable would add travel service customers to the list when orders were placed. Second, Rateable worked with a Russian actor, "Yangboyz," he met through Telegram. Yangboyz had access to compromised

 Defendant's Initials CKT

loyalty program accounts and would book flights for Rateable using the stolen miles in exchange for a fee.

4. The Mentorship and VIP Programs

Noir's Organization offered a "Mentorship Program" for $2,500. The price was eventually raised to $3,500. The program purported to teach enrollees how to "become an elite social engineer," "hide your identity online," and "refund US Stores globally." Noir's Organization also offered a VIP Program for mentees and refund service customers who placed orders over $5,000. Noir's Organization advertised that VIP members would have access to exclusive perks, including discounted refunds, first class flights, wagyu steak dinners, social engineer methods, as well as Noir's "expertise and guidance."

B. Tran's Role in Noir's Organization

CK CHIKONG TRAN controlled the Telegram persona "Radiant." TRAN operated his own refunding service called "Radiant's Elite Refunds" on Telegram, which he eventually closed. He also operated a channel named "Radiance Market," which was a general market where users advertised an assortment of services, including fraud services.

TRAN conspired with Noir and Noir's Organization. On several occasions during the conspiracy charged in the Indictment, TRAN provided advice to Noir's Organization about the status of his refund fraud project, including marketing insight about how to structure its operations. TRAN was never paid by Noir's Organization for his advice. TRAN did not conduct operations for Noir's Organization. He was a consultant rather than an employee of the group. TRAN was given special access to the Telegram channel "Noir's Market" by Noir. This channel was used by Noir's Organization to advertise the conspiracy. Links to the Google Forms to receive refund fraud orders were often posted in the channel.

***

The parties stipulate that venue is appropriate in the Northern District of Alabama. The parties also stipulate that TRAN does not qualify for an aggravating role enhancement under U.S.S.G. § 3B1.1 based on his conduct in the conspiracy.

 Defendant's Initials CKT

**The defendant hereby stipulates that the facts stated above are substantially correct and that the Court can use these facts in calculating the defendant's sentence. The defendant further acknowledges that these facts do not constitute all of the evidence of each and every act that the defendant and/or any co-conspirators may have committed.**

CK Tran

**CK CHIKONG TRAN**

## III. RECOMMENDED SENTENCE

Subject to the limitations in Section VII regarding subsequent conduct and pursuant to Fed. R. Crim. P. 11(c)(1)(B), the Government will recommend the following disposition:

A. That the defendant be awarded a two (2) level reduction in the defendant's adjusted offense level, based upon the defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the defendant's criminal conduct. The Government agrees to make a motion pursuant to USSG §3E1.1(b) for an additional one-level decrease in recognition of the defendant's prompt notification to the Government of the intention to enter a plea of guilty. The Government may oppose any adjustment for acceptance of responsibility if the defendant: (1) fails to admit each and every item in the factual stipulation; (2) denies involvement in the offense; (3) gives conflicting statements about the defendant's involvement in the offense; (4) is untruthful with the Court, the Government, or the United States Probation Officer; (5) obstructs or attempts to obstruct justice prior to sentencing; (6) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (7) attempts to withdraw the defendant's plea of guilty for any reason other than those expressly enumerated in the "Waiver of Right to Appeal and Post-Conviction Relief" section of this Plea Agreement;



Defendant's Initials CkT

B. That the defendant be remanded to the custody of the Bureau of Prisons and incarcerated for a term at the low end of the advisory United States Sentencing Guideline range as calculated by the Court at the time of sentencing;

C. That following the said term of imprisonment, the defendant be placed on supervised release for a period to be determined by the Court, subject to the Court's standard conditions of supervised release and the any special conditions deemed appropriate by the Court of the Probation Office;

D. That the defendant be required to pay restitution to all the victims of the defendant's crimes.

E. That the defendant be required to pay a fine in accordance with the sentencing guidelines should the Court determine that the defendant has the ability to pay a fine, said amount due and owing as of the date sentence is pronounced, with any outstanding balance to be paid in full by the expiration of the term of supervised release; and

F. That the defendant pay a special assessment of $100, said amount due and owing as of the date sentence is pronounced.

## IV. WAIVERS

### A. STATUTE OF LIMITATIONS WAIVER

**In consideration of the recommended disposition of this case, I, CK CHIKONG TRAN, hereby understand, acknowledge, and agree that if this plea agreement is set aside for any reason, I will not assert any defense based on any applicable statute of limitations or the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.*, that includes the passage of time from and including the date of this plea**

 Defendant's Initials CKT

agreement until and including the date of entry of any order setting this plea agreement aside.

B. RIGHT TO APPEAL AND POST-CONVICTION RELIEF

In consideration of the recommended disposition of this case, I, CK CHIKONG TRAN, hereby waive and give up my right to appeal my conviction and/or sentence in this case, as well as any fines, restitution, and forfeiture orders, the Court might impose. Further, I waive and give up the right to challenge my conviction and/or sentence, any fines, restitution, forfeiture orders imposed or the manner in which my conviction and/or sentence, any fines, restitution, and forfeiture orders were determined in any post-conviction proceeding, including, but not limited to, a motion brought under 28 U.S.C. § 2255, and any argument that (1) the statute(s) to which I am pleading guilty is or are unconstitutional or (2) the admitted conduct does not fall within the scope of the statute(s).

The defendant reserves the right to contest in an appeal or post-conviction proceeding(s) the following:

5. Any sentence imposed in excess of the applicable statutory maximum sentence(s);

6. Any sentence imposed in excess of the Guidelines range determined by the Court at the time sentence is imposed; and

7. Ineffective assistance of counsel.

 Defendant's Initials CKT

**The defendant acknowledges that before giving up these rights, the defendant discussed the United States Sentencing Guidelines and their application to the defendant's case with the defendant's attorney, who explained them to the defendant's satisfaction. The defendant further acknowledges and understands that the Government retains its right to appeal where authorized by statute.**

**I, CK CHIKONG TRAN, hereby place my signature on the line directly below to signify that I fully understand the foregoing paragraphs, and that I am knowingly and voluntarily entering into this waiver.**

CK Tran

**CK CHIKONG TRAN**

## V. UNITED STATES SENTENCING GUIDELINES

The defendant's counsel has explained to the defendant, that in light of the United States Supreme Court's decision in *United States v. Booker*, the federal sentencing guidelines are **advisory** in nature. Sentencing is in the Court's discretion and is not required to be within the guideline range. The defendant agrees that, pursuant to this agreement, the Court may use facts it finds by a preponderance of the evidence to reach an advisory guideline range, and the defendant explicitly waives any right to have those facts found by a jury beyond a reasonable doubt.

 Defendant's Initials CKT

## VI. AGREEMENT NOT BINDING ON COURT

The defendant fully and completely understands and agrees that it is the Court's duty to impose sentence upon the defendant and that any sentence recommended by the Government is **NOT BINDING UPON THE COURT,** and that the Court is not required to accept the Government's recommendation. Further, the defendant understands that if the Court does not accept the Government's recommendation, the defendant does not have the right to withdraw the guilty plea.

## VII. VOIDING OF AGREEMENT

The defendant understands that if the defendant (a) violates any federal, state, or local law or any condition of pretrial release after entering into this plea agreement, (b) moves the Court to accept a plea of guilty in accordance with, or pursuant to, the provisions of *North Carolina v. Alford*, 400 U.S. 25 (1970), (c) tenders a plea of *nolo contendere* to the charges, (d) violates any other term of this plea agreement, and/or (e) does or says anything that is inconsistent with the acceptance of responsibility, the plea agreement will become NULL and VOID at the election of the United States, and the United States will not be bound by any of the terms, conditions, or recommendations, express or implied, which are contained herein. Further, such election will not entitle the defendant to withdraw a previously entered plea.



Defendant's Initials CKT

## VIII. OTHER DISTRICTS AND JURISDICTIONS

The defendant understands and agrees that this agreement **DOES NOT BIND** any other United States Attorney in any other district, or any other state or local authority.

## IX. COLLECTION OF FINANCIAL OBLIGATION

In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees to:

- fully disclose all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party;
- promptly submit a completed financial statement to the United States Attorney's Office, in a form that it provides and as it directs;
- identify all assets over which the defendant exercises or exercised control, directly or indirectly, within the past five years, or in which the defendant has or had during that time any financial interest;
- take all steps as requested by the Government to obtain from any other parties by any lawful means any records of assets owned at any time by the defendant;
- undergo any polygraph examination the Government may choose to administer concerning such assets and to provide and/or consent to the release of the defendant's tax returns for the previous five years.

 Defendant's Initials CKT

The defendant further agrees that the above information, as well as any of the defendant's financial statements and disclosures, will be complete, accurate, and truthful. Finally, the defendant expressly authorizes the United States Attorney's Office to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

## X. AGREEMENT REGARDING RELEVANT CONDUCT AND RESTITUTION

As part of the defendant's plea agreement, the defendant admits to the above facts associated with the charges and relevant conduct for any other acts. The defendant understands and agrees that the relevant conduct contained in the factual basis will be used by the Court to determine the defendant's range of punishment under the advisory sentencing guidelines. The defendant admits that all of the crimes listed in the factual basis are part of the same acts, scheme, and course of conduct. This agreement is not meant, however, to prohibit the United States Probation Office or the Court from considering any other acts and factors, which may constitute or relate to relevant conduct. Additionally, if this agreement contains any provisions providing for the dismissal of any counts, the defendant agrees to pay any appropriate restitution to each of the separate and proximate victims related to those counts should there be any and waives objection to the inclusion of that restitution in any order issued by the Court.

 Defendant's Initials CKT

## XI. TAX, FORFEITURE AND OTHER CIVIL/ADMINISTRATIVE PROCEEDINGS

Unless otherwise specified herein, the defendant understands and acknowledges that this agreement does not apply to or in any way limit any pending or prospective proceedings related to the defendant's **tax liabilities**, if any, or to any pending or prospective **forfeiture** or other **civil** or **administrative** proceedings.

## XII. IMMIGRATION STATUS

The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense(s) to which the defendant is pleading guilty. The defendant's guilty plea and conviction make it practically inevitable and a virtual certainty that the defendant will be removed or deported from the United States if the defendant is not a citizen of the United States. Removal and other immigration consequences are the subject of a separate proceeding, however; and the defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. Understanding all of this, the defendant nevertheless affirms that the defendant wants to plead guilty regardless of any immigration consequences that plea may entail, even if the consequence is automatic removal from the United States.

 Defendant's Initials CKT

## XIII. DEFENDANT'S ACKNOWLEDGEMENT

I have read and understand the provisions of this plea agreement consisting of 23 pages. I have discussed the case and my constitutional and other rights with my lawyer. I am satisfied with my lawyer's representation in this case. I understand that by pleading guilty, I will be waiving and giving up my right to continue to plead not guilty, to a trial by jury, to the assistance of counsel at that trial, to confront, cross-examine, or compel the attendance of witnesses, to present evidence on my behalf, to maintain my privilege against self-incrimination, and to the presumption of innocence. I agree to enter my plea as indicated above on the terms and conditions set forth herein.

**NO PROMISES OR REPRESENTATIONS OTHER THAN THOSE IN THE AGREEMENT HAVE BEEN MADE TO ME BY THE PROSECUTOR, OR BY ANYONE ELSE, NOR HAVE ANY THREATS BEEN MADE OR FORCE USED TO INDUCE ME TO PLEAD GUILTY.**

I further state that I have not had any drugs, medication, or alcohol within the past 48 hours except as stated here:

NONE

I understand that this plea agreement will take effect and will be binding as to the Parties **only** after all necessary signatures have been affixed hereto. I have personally and voluntarily placed my initials on every page of this plea agreement

and have signed the signature line below to indicate that I have read, understand, and approve all of the provisions of this plea agreement, both individually and as a total binding agreement.

10/18/2024
DATE

CK Tran
CK CHIKONG TRAN
Defendant

## XIV. COUNSEL'S ACKNOWLEDGMENT

I have discussed this case with my client in detail and have advised my client of all of my client's rights and all possible defenses. My client has conveyed to me that my client understands this plea agreement and consents to all its terms. I believe the plea and disposition set forth herein are appropriate under the facts of this case and are in accord with my best judgment. I concur in the entry of the plea agreement on the terms and conditions set forth herein.

10/18/2024
DATE

Alison Wallace
ALISON WALLACE
Defendant's Counsel



Defendant's Initials CKT

## XV. GOVERNMENT'S ACKNOWLEDGMENT

I have reviewed this matter and this plea agreement and concur that the plea and disposition set forth herein are appropriate and are in the interests of justice.

PRIM F. ESCALONA
United States Attorney

10/21/24
DATE

JOHN M. HUNDSCHEID
Assistant United States Attorney



Defendant's Initials CKT

(Revised June 2022)

Doc. 194

Objections to PSR

FILED
2025 Mar-02 PM 06:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,** | ) |
| | ) |
| **PLAINTIFF,** | ) |
| | ) |
| **VS.** | ) **CASE NUMBER: 4:23-CR-383-CLM** |
| | ) |
| **CK CHIKONG TRAN**, | ) |
| | ) |
| **DEFENDANT.** | ) |

**OBJECTION TO PRE-SENTENCE INVESTIGATION REPORT**

Comes now the defendant and objects to the Pre-Sentence Investigation Report on the following grounds:

1. Defendant objects to paragraph 27 in that he was not involved in the conspiracy for the entire length of said conspiracy. Defendant states that he was not ultimately involved during the start of the Noir refund service. Therefore was not involved in the conspiracy in its entirety. Defendant alleges that his participation began in November 2021 not July 2020.
2. Defendant objects to paragraph 61 as the number of victims being more than 10. Defendant states the number of victims involved during his time of involvement would be less than 10. Therefore 2 levels should not be added. The proper Adjusted Offense Level (Subtotal) should be 25.
3. Defendant objects to paragraph 70 as the total offense level should be 20.
4. Defendant objects to paragraph 76 because he was never involved with the drugs but was bullied into pleading guilty.

5. Defendant objects to paragraph 102 as the guideline range should be 33 to 41 months.

**WHEREFORE, PREMISES CONSIDERED**, Defendant CK Chikong Tran, prays this Honorable Court will consider the foregoing objection.

Respectfully submitted,

/s/Alison Wallace
Alison Wallace
P.O. Box 36926
Hoover, AL 35236
(205) 500-1667
E-mail: alisonatlaw@gmail.com
ASB-1161-E45A

**CERTIFICATE OF SERVICE**

I hereby certify that on March 2 2025, I electronically filed the foregoing using the CM/ECF system which will send notification of such filing.

/s/ Alison Wallace

Doc. 247
Sentencing Memorandum

FILED
2026 Apr-06 AM 07:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **V.** | ) | |
| | ) | **CASE NO: 4:23-CR-383-CLM-NAD** |
| | ) | |
| **CK CHIKONG TRAN,** | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant files this sentencing memorandum setting forth the relevant factors that the Court should consider in determining what type and length of sentence is sufficient but not greater than necessary to comply with the statutory directives set forth in 18 U.S.C. 3553(a) and the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738, 756 (2005) in this cause.

**APPLICATION OF STATUTORY SENTENCING FACTORS PURSUANT TO 18 U.S.C. 3553(a) TO THE FACTS OF THIS CASE.**

Instead of being bound by the Sentencing Guidelines in a mandatory or presumptive manner, the Court is now permitted to tailor a sentence in light of statutory factors under 18 U.S.C. 3553(a). Also, 18 U.S.C. 3661 recognizes that no limitation shall be placed on the information concerning his background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

In the present case, the following factors should be when determining what type and length of sentence is sufficient to satisfy the purposes of sentencing:

**I. The Nature and Circumstances of the Offense and History and Characteristics of the Offender, and**

**II. The need for the Sentence Imposed to Promote Certain Statutory Objectives:**

**(A) to reflect the seriousness of the offense, promote respect for law, and provide just punishment for the offense;**

**(B) to afford adequate deterrence to criminal conduct;**

**(C) to protect the public from further crimes of the defendant;**

**(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

## Argument

### I. The Nature and Circumstances of the Offense and History and Characteristics of the Offender.

#### (A) Nature and Circumstances of the Offense and Mr. Tran's Discrepancy

Mr. Tran represents a major discrepancy in this case when compared to the other co-defendants. He is the least, or hardly, a culpable actor in this matter. Critically, Mr. Tran never performed any refunds for Noir Enterprises. His only contribution to the communication groups was occasionally offering circumstantially insignificant advice or insights into the general operation or viability of certain programs. Data analytics further confirm that the nature of Mr. Tran's communications were fundamentally based on criticisms of Noir and the business model itself. Furthermore, Mr. Tran maintained no paid affiliation with Noir Enterprises.

#### (B) History and Characteristics of Mr. Tran

Mr. Tran is a young man that has survived a traumatic childhood due to complex family dynamics and physical health issues.

Mr. Tran has no criminal history. This offense represents a complete deviation from an

otherwise law-abiding life. He has a history of being a productive member of society and has demonstrated a commitment to personal and professional growth outside the limited conduct in this case.

As a testament to his dedication to rehabilitation, Mr. Tran successfully completed the Focus Forward Program.

Mr. Tran maintains the steadfast support of his family and community, ensuring he has a stable environment and the necessary resources to remain a law-abiding citizen. Based on the foregoing Mr. Tran is a low-risk candidate for supervision.

**(C) Data Analytics- Quantitative Limitation of Involvement Assessment**

To provide the Court with objective evidence of Mr. Tran's limited involvement, a multi-model data analysis was conducted using a consensus of the latest most powerful AI technologies – ChatGPT, Claude, Gemini and Grok. These systems cross-referenced the group's communication logs to determine unified results.

The findings are as follows:

Minimal Statistical Footprint: Out of the hundreds of thousands of messages exchanged within the conspiracy's chat logs, Mr. Tran accounted for a statistically negligible 0.6% of total message volume.

Operational Irrelevance: Approximately 85% of Mr. Tran's limited communications consisted of casual banter, trading discussions, or meta-critiques. Only 15% of his messages touched on business operations.

The True Operational Footprint: When adjusting his volume by actual business relevant output, Mr. Tran's functional footprint in the conspiracy is a mere .09%. Statistically, less than

one-tenth of one percent of the group's operational dialogue is attributable to him.

Timing and Engagement Pattern: Mr. Tran's participation was intermittent and "burst-heavy". While the broader conspiracy spanned from 2020 to 2022. Mr. Tran's activity was not present until January 30, 2022. He was a peripheral critic who engaged in "argument loops" but was entirely absent from the execution, logistics or sifting that defined the fraud.

## II. The Need for the Sentence Imposed to Promote Certain Statutory Objectives:

**(A) to reflect the seriousness of the offense, promote respect for law, and provide just punishment for the offense;**

**(B) to afford adequate deterrence to criminal conduct;**

**(C) to protect the public from further crimes of the defendant;**

**(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

A sentence at the low end of the guidelines – or a non-custodial sentence- is sufficient, but not greater than necessary, to reflect the seriousness of the offense and promote respect for the law. Given his .09% true relevance score, a custodial sentence would be disproportionate to his actual role. The primary goal of deterrence has been met by the legal process itself, and given his history, there is no need to protect the public from further crimes of this defendant.

The defendant asserts that the sentencing objectives can be satisfied by a non-custodial sentence at the low end of the guidelines. Tran is suffering from many emotional and physical impairments which make incarceration a logistical difficulty. A sentence at the low end of the guidelines can be imposed to satisfy the primary directive of 3553(a) to impose a sentence

sufficient, but not greater than necessary to comply with the purposes set forth in 3553(a)(A-D).

As one function of punishment is to deter both this defendant and others, it is submitted that the element of deterrence has been satisfied in this case.

**PROPOSED SENTENCING RANGE AND SENTENCE:**

The sentencing guideline range is dependent upon the Court's rulings on the objections. However, because Mr. Tran did not enter the group until late January 2022, he cannot be held liable for the full loss amount or the total number of victims involved in the multi-year conspiracy. Under *U.S. v* Hunter, 323 F. 3d 1314 (2003), the Court must make an individualized finding of reasonably foreseeable loss. After his review of the Excel spread sheets, Mr. Tran argues that the appropriate loss amount for his guidelines would be $37,594.50. That amount corresponds to a starting date of January 31, 2022 and ending on February 12, 2022.

Mr. Tran respectfully requests that the Court consider his affiliation but lack of involvement, and his personal characteristics to impose a sentence that is sufficient, but not greater than necessary,

Respectfully submitted,

/s/ Alison Wallace
Alison Wallace
P O Box 36926
Hoover, AL 35236
(205) 500-1667

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the above and foregoing sentencing memorandum upon opposing counsel and the United States Probation Officer on April 2, 2026,

by electronically filing the same with the Clerk of the Court using the CM/ECF system.

/s/ Alison Wallace

Doc. 262
Notice of Appeal

FILED
2026 Apr-17 AM 05:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | **4:23-cr-383-CLN-NAD** |
| | ) | |
| **CK CHIKONG TRAN,** | ) | |

**NOTICE OF APPEAL AND**
**MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS**

COMES NOW the Defendant, CK Chikong Tran, through his appointed counsel, Alison Wallace, and respectfully gives notice of his claim of appeal to the United States Court of Appeals for the Eleventh Circuit from the sentence pronounced on April 16, 2026, in the above captioned case.

Defendant further moves this Court to allow him to appeal in forma pauperis, and to show his indigence he was allowed to proceed as such in District Court, and his financial circumstances have not improved.

Respectfully Submitted,

/s/ *Alison Wallace*
ALISON WALLACE
Attorney for the Defendant
P.O. Box 36926
Hoover, Alabama 35236
(205) 500-1667
Email: alisonatlaw@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above has been served upon the attorney for the United States on this date via CM/ECF.

/s/ *Alison Wallace*
Of Counsel

Doc. 264, 264-1 to -9
Exhibits from Sentencing Hearing

FILED
2026 Apr-17 PM 02:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

**STYLE: 4:23-cr-00383-CLM-NAD USA v. Kaif et al**

**Sentencing hearing 4/16/2026**

| NOT OFFERED | NUMBER | IDENTIFIED | RULING ON OBJECTION (if any) | | | RULING ON REOFFER | | RECD. COND. OR LTD. | RECEIVED | EXHIBITS<br>PLAINTIFF<br>GOVERNMENT<br>DEFENDANT<br>COURT<br>JOINT |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | SUS | O/R | RES | SUS | O/R | | | DESCRIPTION |
| | 1 | | | | | | | | | A |
| | 2 | | | | | | | | | B |
| | 3 | | | | | | | | | C |
| | 4 | | | | | | | | | D |
| | 5 | | | | | | | | | E |
| | 6 | | | | | | | | | F |
| | 7 | | | | | | | | | G |
| | 8 | | | | | | | | | H |
| | 9 | | | | | | | | | I |
| | 10 | | | | | | | | | |

FILED
2026 Apr-17 PM 02:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

Exhibit A

(The File is too large, so the entries have been reduced for the purposes of Printing.)

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ............ | | | | | | | | |
| ............ | | | | | | | | |
| 12/08/2021 10:4 | Kill3rdan@yahoo | Daniel Jeon | $ | 4,788.27 | Kill3rdan@yahoo.com:La | Yes | Telegram Groupchat | |
| 12/08/2021 10:4 | marlubiria@gma | Mariam Ubiria | $ | 969.99 | marlubiria@gmail.com : | Yes | Friend Referral | |
| 12/09/2021 5:03 | ps4gunner@gma | David De los San | $ | 1,576.11 | Email: ps4gunner@gmail | No | Telegram Groupchat | |
| 12/09/2021 6:59 | mozee@wisc.ed | Devin | $ | 793.94 | mozee@wisc.edu:supera | No | Friend Referral | |
| 12/09/2021 8:38 | Steamziye@gma | Ziv Tuaf | $ | 689.32 | Steamziye@gmail.com | No | Friend Referral | |
| 12/9/21 21:54 | | ethan | $ | 20,000.00 | | | | |
| 12/9/21 22:21 | | Bryan Henry | $ | 36,000.00 | | | | |
| 12/9/21 22:54 | | Gavin | $ | 10,000.00 | | | | |
| 12/9/21 17:39 | | | $ | 9,166.72 | | | | |
| 12/10/2021 8:31 | shashidharsharm | Shashidhara sha | $ | 2,017.69 | shashidharsharmaus@gr | Yes | Telegram Groupchat | |
| 12/10/21 3:45 | | Davcki | $ | 7,260.34 | | | | |
| 12/10/21 11:26 | | RJ | $ | 8,500.00 | | | | |
| 12/10/21 13:19 | | Gregory | $ | 30,000.00 | | | | |
| 12/10/21 18:28 | | Allan | $ | 5,000.00 | | | | |
| 12/10/21 0:25 | | | $ | 1,703.34 | | | | |
| 12/10/21 23:44 | | | $ | 3,000.88 | https://drive.google.com/open?id=1O0yZwYD4G4y0Zt4V1FINk_Wmzb_al3xO | | | |
| 12/11/2021 12:1 | A.charles94@gm | Allan Charles | $ | 1,918.40 | A.charles94@gmail.com | No | Telegram Groupchat | |
| 12/12/2021 1:02 | crabs_daemon_( | Jarrod | $ | 398.76 | crabs_daemon_0e@iclo | No | Telegram Groupchat | |
| 12/12/2021 1:08 | missashleyros3@ | ashley johnson | $ | 335.62 | missashleyros3@gmail.c | No | Telegram Groupchat | |
| 12/12/21 4:48 | | Danny | $ | 60,000.00 | | | | |
| 12/13/2021 4:57 | ezy071@icloud.c | Tawana Gray | $ | 1,317.51 | Basalm Hill Email: tawan | No | Telegram Groupchat | |
| 12/13/2021 5:15 | Hunter1247@pr | Sam Hunter | $ | 3,388.82 | Hunter1247@Protonmai | Yes | Telegram Groupchat | |
| 12/13/2021 8:50 | Ryanmcgowan81 | Ryan McGowan | $ | 426.93 | Ryanmcgowan8119@gm | No | Cracked.to | |
| 12/13/21 11:39 | | | $ | 9,033.69 | https://drive.google.com/open?id=11HjiynldHnc8S4WCWeoN66HQ-FBEyocA, https://drive.google.com/open?id=1q7YbSoXgCSJ3ah0kpvCAoncAbOGaRIIL, https://drive.google.com/open?id=12hZHiqe6i9yaA6_MOUsm1DNnf3lrIAd | | | |
| 12/14/2021 2:08 | ashleyvargas.g@ | Ashley vargas | $ | 2,383.00 | ashleyvargas.g@outlook. | No | Telegram Groupchat | |
| 12/14/2021 8:18 | A.detezanos21@ | Aerial detezanos | $ | 435.91 | A.detezanos21@icloud.c | No | Telegram Groupchat | |
| 12/23/21 21:30 | rogermusa@gm | Roger Musa | $ | 9,984.27 | rogermusa@gmail.com:L "New Apple iPad Pro 12 | No | | 1Z2232WW1206775360 1Z2232WW1206775351 1Z2232WW1206775379 1Z2232WW1206775388 1Z2232WW1206775397 |
| ............ | ............ | | | | | | | |
| 12/23/21 12:21 | | Priyank patel | $ | 3,400.00 | .. | | | Nsbsas |
| 12/23/21 19:17 | | Daniel Infantas | $ | 2,045.83 | Lorddannyy@gmail.com:Amazon920! | | | 1Z6216A80303705149 USPS |
| 1/19/22 18:16 | Athomson@swe | Ashia Thomson | $ | 9,870.02 | Athomson@sweeneycpa 2 silver Ipad pro 2TB, 2g | No | | "1Z2232WW1213947616 1Z86V7401211680661 1Z2232WW1213947607 1Z2232WW1213947590" |
| 1/25/22 23:32 | trimaanm@cox.i | Trimaan Malik | $ | 1,349.26 | billhudson33303@gmail. Legion 5 Gen 6 AMD (17 | Yes | | 1Z9918AW3507653000 |
| 01/29/2022 6:13 | 3541clarksonsup | Selmir Hadzijic | $ | 5,878.00 | 3541clarksonsuper@gm: | Yes | Telegram Groupchat | |
| 01/31/2022 10:4 | ezy071@icloud.c | Elliott Adams | $ | 3,422.16 | ezy071@icloud.com , Jim | No | Telegram Groupchat | |
| 2/1/22 12:19 | raulincan@gmai | Raul Candelario | $ | 7,070.00 | sign in w google. Raulinc canon r5, canon lens, m | Yes | | 1Z0X118A4264610569, 1Z0X118A4282403642 |
| 2/2/22 14:29 | adialys98@gmai | Adialys Pol Hern | $ | 9,763.00 | adialys98@gmail.com Gaming Laptops | No | | "1Z44VA950311267208 1Z44VA950311267048" |
| 2/3/22 15:30 | gamesrcool3@gi | James Macoy | $ | 1,192.11 | gamesrcool3@gmail.com surface 8 | No | | 1Z5XR8660258317014 |
| 2/8/22 17:44 | Mrfaceslimer@g | Jake Vella | $ | 2,116.67 | Mrfaceslimer@gmail.con Legion Slim 7 Gen 6 AM | No | | 1Z992AE0DG44557239 |
| 2/8/22 14:59 | | | $ | 6,721.58 | | | | |
| 2/9/22 14:16 | thecatcat1@hot | Nabeel Mirza | $ | 5,017.18 | thecatcat1@hotmail.com 2 Surface Pro 8, various | No | | 5.60E+11 |
| 2/12/22 17:08 | Ahmedruhin26@ | Ruhin | $ | 2,291.80 | Ahmedruhin26@gmail.cc Apple Ipad | Yes | | 1Z2232WW1220803605 |

**Total All Orders:** $1,215,225.40

Order Total of Errors: $ 197,751.98

**REASON:** These orders have critical orders, because these entries all lack the following: *Account Data, Product Data, Email Association, and no information about where the service was discovered.*

**Order Total from Jan 31 2022:** $ 30,872.92

FILED
2026 Apr-17 PM 02:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

**EXHIBIT B: Anime Fan Club Chat – Page 195**

Chat found on Feb 4th, in relation to Apple Products. ***See below for Samsung-related date.***

Noir Organization did not continue the conversation in regards to Apple, and the topic changed.

?? 16:35

Radiant 16:35
Apple has a system in place where if they detect a number of problems from the same number etc, they would be linked and inclined to fail

Noir — @TheRefundBot 16:36
How'd you figure that out

Radiant 16:36
I know this because I have tested it

across a few months 16:36

alternating between numbers 16:36

Noir — @TheRefundBot 16:36
K

Radiant 16:36
As a business, if they face an influx of issues, they also all get halted

Dash 16:36
In reply to this message
He's correct

Can confirm 16:37

My 3 cancelled macs and one cancelled dip 16:37

[redacted]

In reply to this message
He's correct

Can confirm

My 3 cancelled macs and one cancelled di

Reign
In reply to this message

[redacted]

This is true

Noir — @TheRefundBot
So stop pushing for apple or

Push for amazon instead

let me think of an amazon promo

Dash
No

I'm the promo guy now

I'll get back to you in 5 business days

Reign
loool

**Page 137 - Samsung Related Conversation Thereafter**
**Starts March 30th 2022**

Radiant 13:24
Yes, EB works on Samsung. can be annoying depending if a rep happens to karen up your case

Bianca 13:24
jjj

Radiant 13:24
in that situation, you would have to exhcnage many more emails to push for a refund

Dash 13:25
Yea I can't deal with stores like that

Also 13:25

Northway 13:25
that shit is mad annoying

LMAO 13:25

Dash 13:25
Does anyone know where to get vanillas

Hey north, you every try ftid on a stockx sale? 13:25

I have a really aged selling account and want to try it one time 13:26

Radiant 13:26
vanillas

FILED
2026 Apr-17 PM 02:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

**(EXHIBIT C)**

As reflected in Defendant's prior interview with the Government, these communications involved an individual identified as Michelle Nunez, with whom Defendant was in a long-term relationship during the relevant period. Based on representations made to him at the time, Defendant believed that she was in a situation involving human trafficking and in need of financial assistance.

During the period from approximately **January through March 2020**, Defendant was shown photographs and videos that he understood to corroborate those representations, which influenced his judgment and decision-making at that time.

Defendant provides this background solely to offer context regarding his state of mind and motivations during the initial period in which he became involved in online financial activity. Defendant acknowledges that his actions were based on incomplete and inaccurate information and accepts responsibility for his conduct.









_deleted_bhiebeahhfbgebcea

Jan 03, 2020

Unavailable message
Unavailable message

Unavailable message
Unavailable message

Unavailable message
Unavailable message

Jan 03, 2020

It's been 4 days and I'm worried about you.

Jan 03, 2020

How can he keep you so long and not feed you what the fuck

Jan 03, 2020

If he's not feeding you then can he be trusted here I don't know, please be careful

Jan 03, 2020

Why would he need to lock you in there with limited phone access what the hell

Message...

---

**RawPlayLand**

literally lost over 6k and you expect me to lose 30k that I don't have or something.

RAWPLAYLAND

???? what what the fuck are you talking about you told me this in advance I just started talking to you now after nearly a year 1/2 if you can't help me fine fuck it i always find a way you left me in Florida you gonna do it again I don't care bro I got my ass back in the USA on my own you really think I wanted to hit you up to ask for your help when I know I already own you money from the shit my family put us thru I don't want your fucking money I want your fucking help but I also want my life and will not get taken no matter what you say your not the cops who are in it an thats the shit your not understanding ill stay out here I know your address ill find a job ill send you what I can fuck it I been thro to much to have you come at me over some shit you have no idea how deep it runs at least now im with someone who does and she's going to help me buy a car instead of wasting money on a fucking rental like I been ask you to do for us before this whole fucking mess cuz they asking for 936 for the first van breaking down on its own in the middle of the fucking desert im on the phone with the budget ppl now

ME

Michelle I dont care about the money you owe me

I care about you

This entire thing is too much

This will be the last time you switch plans on me and I told you this already

I have nothing to give you and I don't care what new help you have

---

RawPlayLand

WHEN I WAS TAKEN IT WASN'T EASY AND NOW IT SEEMS I HAVE TO GO DOWN THAT PATH TO GET MYSELF OUT SMFH STOP PRETENDING TO BE RELIABLE

Send a chat

---

Raw PlayLand

Well I just want to speak with her.

How did she come up to be some call girl anyway

Colorado right? Maybe I'll come visit and have my talk.

Shes working right now boy

I need to speak with her when possible

Please allow me to

She was sold to us no pay no talk

...sold? The hell.

Is she your wife

No she is someone special in my life

She went missing and I have been searching

Are you deondra Lindsey by any chance?

Every hoe is special homeboy Shes our property now nigga she ain't missing shes working Idk that nigga no pay no bitches

Can you tell me from where did you guys buy her? How did that go down

---

**RawPlayLand**

done asap. CALL ME

RAWPLAYLAND

I been walking for the past 2 days now to get to the nearest gas station out here to get wifi an gas my phone is off I told you they charged 936 on the card for switching the first van coming out to get it i can't do nothing about that I have no gas no food no water no service no money I'm stuck out here I drive until I couldn't waiting on you to help I'm fucking tired im hungry i had to leave everything behind again my feet are bleeding from all this fucking walking my skin is burned im in so much pain an this gas station doesn't have wifi this man is letting me Hotspot plz send help asap he is leaving soon an I again will be alone out here with nothing to keep moving

ME

Michelle this is all what I said would happen

I'm going to try and send you money asap but I can't cover the full 936 even.

RAWPLAYLAND

my card is -936 how are you suppose to send money with the bank taking that first it doesn't work that way you know this

this man is about to leave

ME

That's exactly what what I mean

RAWPLAYLAND

I won't have no wifi to contact you an the asshole won't let me use his phone to call you right now I know I'm dirty an smelling but fuck

ME

I told you the situation would get bad and I gave


rawplayland
From Create Mode
I had hoped someone passed on my sos I know you would have helped me or maybe I guess not ... last words .... fuck everyone
Send message


rawplayland 21m
From Create Mode
it's so fucking hot the bottom of my shoes is melting off an This so called priest got me fucked up if he thinks I'm having sex with him you just want to fuck me you not even feeding me or helping in no way I fucking hate people
Send message


rawplayland 3h
help me right now im in a city
Send message


RawPlayLand
STOP PRETENDING TO HELP AND HELP IF YOU REALLY I NEED MY CREDIT CARD OUT THE NEGATIVE TO GET OUT OF HERE AND MY MSG AN POST AIN'T POSTING EVEN WITH THE SHITTY SERVICE OUT HERE THAT I DO MANAGE TO FIND BUT NOT REALLY IT COULD BE DAYS BEFORE MY SHIT IS SENT
Send a chat


69391rjdw
Active 3h ago
69391rjdw
Instagram
0 followers · 0 posts
You don't follow each other on Instagram
New Instagram account
View Profile
Today 2:05 PM
she has till the end of the day she keeps fighting she asked for help to send this out
Double tap to
End of the day for what
I have no idea how to help.
What's the location? What's address?
?
Today 5:32 PM
Please tell me
I need an address or license plate.
Message...


rawplayland
Today 3:01 PM
Are you there
Are you OK
Today 4:12 PM
no she's not i have her account now they switching girls out she was waiting for a friend to send help but it didn't happen
You said end of day
It's only been a few hours. What help is expected?
Please call 911 for her.
I'm not sure what I can do here, and so please help us
I didn't say that sir they switching girls out and now I have her account she said she was waiting on a friend to help her but he never did maybe another girl each out hopefully her friend helps her it might be her last day with us
I gotta go sorry sir
Double tap to
I'm trying my best
Message...

After Defendant began to question the accuracy of the representations made to him, the individual created an additional social media account and posted content that appeared intended to reinforce those prior representations. Defendant has provided an enlarged version of the relevant image to allow the Court to clearly review the associated posts.

The account in question reflected limited activity and was following only Defendant, and the content included references to Defendant by name. Based on these circumstances, Defendant understood the posts to be directed toward him and intended to influence his perception of the situation.



FILED
2026 Apr-17 PM 02:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

**(EXHIBIT D)** – This shows that Mr. Tran was a super-admin, with a dedicated group meant for banning users across 50+ groups with one single admin command.



FILED
2026 Apr-17 PM 02:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

Exhibit E

1

# Deleted Account

23 March 2020

**Deleted Account** 15:08

Walmart refunds ?

**Radiant** 15:09

Yes

**Deleted Account** 15:16

Can you do it for Walmart pick ups? Not the grocery app but the actual Walmart app

**Radiant** 15:17

Yes

and this was mentioned on my ad 15:17

**Radiant** 15:17

**Alpaca Channel** 21.03.2020 15:16:05




Contact @Radiantxz to get your Refunds.
Minimum Order Value: $500

- 100% Success Rate
- Works with ANY Payment method
- Make big money.

My Vouches: @RadiantVouch
Channel: @RadiantSales

**Radiant** 15:17

Here it is again for reference

# Deleted Account

R **Radiant** 15:17

yeah nothing wrong with that

**Deleted Account** 15:17

What info do you need? Or do you need to log into my acc

R **Radiant** 15:17

Once your order is delivered/ picked up

you just message me to start, and I'd need your login details 15:17

For Walmart, I take payment before refund process starts as it takes longer 15:18

**Deleted Account** 15:19

Damn no disrespect I understand but I stay getting scammed on telegram. Thank you though!

R **Radiant** 15:19

I accept MM

If you want some assurance, I'm an admin of 4 big groups: AIO Crime, Noir's market, Moonlight market, and FUckKiki's group 15:20

I'm also a fed-admin which means i get to ban in 60+ groups 15:20

let me know 15:20

24 March 2020

**Deleted Account** 22:51

Have you done digital game downloads

R **Radiant** 22:52

If you mean as my refunding service, that is not allowed

**Deleted Account** 22:57

Ooh I'm tryna get animal crossing for the switch but they only got digital download so I ain't know if it works w refunds

R **Radiant** 22:58

Yeah sorry but it doesnt

physical items only 22:58

# Deleted Account

2

26 March 2020

**Deleted Account** 23:52

Are you legit?

**Radiant** 23:52

That's an interesting question

**Deleted Account** 23:52

Yea man too many scammers out there

**Radiant** 23:53

Please check my vouches, if you want some assurance, i am also a fed-admin

Meaning that I can ban in 100+ groups 23:54

27 March 2020

**Deleted Account** 01:04

Send me your group

**Radiant** 01:05

https://t.me/DrakosMarketplace

https://t.me/aiocrime 01:05

https://t.me/alpacamarket 01:05

https://t.me/NoirThePlug 01:05

I'm an admin in all of these groups 01:05

**Deleted Account** 08:18

Okay

FILED
2026 Apr-17 PM 02:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Deleted Account

Exhibit F

14 March 2020

R **Radiant** 13:41

Hey there. I heard that you've got drops available to use. What would you charge?

Noir and I are friends and he gave me your contact 13:41

**Deleted Account** 13:42

Gotcha, let me check with drops guy if he is still alive, virus messing up everyone

R **Radiant** 13:42

alright

**Deleted Account** 19:34

Hey, he said yes, he's going to send me 20

So just keep the items small so the reship fees stay lower. 19:35

R **Radiant** 19:35

so how much do you charge for the drop service

**Deleted Account** 19:35

Oh I am going to sell the items for noir or I think that's the plan

R **Radiant** 19:36

You're misunderstanding.

Noir referred you to me 19:36

Because I am looking for a drop service 19:36

And we also work together 19:36

**Deleted Account** 19:36

Hmm I don't know what my guy will charge he doesn't run it as a service he uses the drops to harvest cell phones mostly

R **Radiant** 19:37

okay well this is a package that requires signature

it's a laptop that i need drop service for 19:38

**Deleted Account** 19:38

The addresses I have will all be like ups

Or mailbox stores 19:38

# Deleted Account

And what do you mean like ups 19:39

**Deleted Account** 19:39

The store fronts

Rented mailboxes 19:39

R **Radiant** 19:40

i see

nevermind 19:40

15 March 2020

**Deleted Account** 12:28

Did noir go on vacation? Or get sick? Usually he responds immediately but he's hasn't answered in 2 days

R **Radiant** 12:54

He was on yesterday

I'm not sure 12:54

**Deleted Account** 12:54

Weird

Ok I'll bug him later 12:55

FILED
2026 Apr-17 PM 02:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

***(Exhibit G) Trololololol = Trolling & Laughing. Being an annoyance for fun.***
***ffs = For Fucks Sake***

## Telegram Bot and Website Project

**Deleted Account** 01:34
@Radiant Hello LOL!

Trololololl 01:35

**Radiant** 01:35
ffs

this asshole never stops with the groups 01:35

**Deleted Account** 01:35
In reply to this message
Read this contract

**Deleted Account** 01:35
Nick 20.12.2021 21:39:05

**Quote for Noir.pdf**
Not included, change data exporting settings to download.
36.7 KB

**Deleted Account** 01:35
It's for a bot

I know chings can't read but please try 01:35

Use text to speech if you have to 01:35

FILED
2026 Apr-17 PM 02:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

**(EXHIBIT H)** Anime Fan Club - Organizing

Radiant 01.03.2022 19:43:14
you dont make any sense

Theres not a single piece of information there that is actually valuable 19:43

People know how to use creditcards 19:43

Noti — @TheRefundBot 19:43
what do you guys think

Push for more content before branching project alpha? 19:43

Deleted Account 19:45
Maybe do it in waves, start a couple farming groups in between each value bomb?

Noti — @TheRefundBot 19:46
There is not one time I asked that mf for his input

And he responded positively 19:46

But I don't suppose he's wrong 19:47

So I gotta come up with some methods asap 19:47

Radiant 19:50
You do not need to come up with methods, or anything

What you lack is a proper plan to deliver anything 19:50

So once you don't commit to doing one thing, you will jump the gun and work on other things 19:51

R

Radiant 19:58

this isn't philosophy

this is people who have paid 2.5k 19:58

to grow tired 19:58

and to be funneledto learn about credit cards 19:58

N

Noir — @TheRefundBot 19:58

lol

R

Radiant 19:59

and how credit is built through paying a credit card

N

Noir — @TheRefundBot 19:59

Your knowledge is very outdated radiant

this isn't mentorship project 19:59

But ok 19:59

All I heard from you is "your introduction to manufactured spending" is too basic when it's just people asking Q/As 19:59

R

Radiant 20:00

Nothing I am saying is outdated, there's literally nothing valuable being offered and that was always the case

If you want to appeal to the weakest and most unintelligent people that do not know how credit cards work 20:00

It's just hey look we tried something and people respond to it

Reign 20:07

In reply to this message

this is true

but it's also the start 20:07

like it launched yesterday 20:07

Or the day before 20:07

or whenever 20:07

Radiant 20:08

Idk, i didn't pay attention to the dates

Reign 20:08

you think it will be cut off there?

Radiant 20:08

I just read all the content because noir asked

Reign 20:08

you have to start small

and I do hope the way it is going is starting small, and pumping out content for people to really get on board with other things because they see value there 20:08

FILED
2026 Apr-17 PM 02:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

(EXHIBIT I)

Noir — @TheRefundBot 01:58

Anyways anyways

So I'm thinking of dividing this company into 2 sectors 01:58

Private Sector & Public Sector 01:58

Public Sector requires the most amount of advertising & marketing 01:59

I'm talking to Dean Martin's friend and he wants to help us grow the public sector

The public sector includes normal refunds & @NoirDD Promos 01:59

The private sector is 01:59

VIP
Mentorship
Project Alpha

We'll hand out new responsibility list & Guidelines 01:59

Some may handle private only and some might handle public only 01:59

Or both. I'm yet to scale the VIP thing & it's still experimental 02:00

The public sector will be managed by Waynor and I, and our new friend "W" will handle forum marketing, telgram marketing, promos and etc 02:00

Private sector will be managed by Waynor and I 02:00

Bianca 02:01

noir i hope u r good

n well 02:01

n healthy 02:01

noir i hope u r good

n well 02:01

n healthy 02:01

n ur dog too 02:01

n ur momma 02:01

Noir — @TheRefundBot 02:01

The public sector will be overseen & Monitored by W

There will be a service health chart that indicates whether or not we're ready to scale 1 step furhter

Right now my chart indicates that we're stabilizing 02:01

Reign 02:01

Noir — @TheRefundBot 02:04

I see progress but at the same time I've anticipated a larger amount of orders volume & well more time efficiency

But that's difficult to achieve most likely since you're doing it on your own 02:04

So what we're going to do is 02:04

We're going to build up a plan for a more efficient store assignment together, live, in a new group dedicated only to VIP management

I'm gonna assign 02:05

Waynor
Northy
Dash (If available)
Reign (Overtime)

Mario's workload is to huge at the moment to be assigned any new tasks 02:05

Deleted Account 02:05

I sent you a chart showing general participation in terms of the order groups.

We've had a large portion of orders that needed to be returned. Ive stopped offering microsoft for instance as we lost 3-4 orders with that.

But yes Im honestly struggling with cat herding everyone along and getting back to everyone efficently we could certainly be in a better place in that regard

Doc. 265
PSR

Doc. 266
Judgment

FILED
2026 Apr-17 PM 02:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

AO 245 S (Rev. 1/98)(N.D.Ala. rev.) Sheet 1 - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Northern District of Alabama

**UNITED STATES OF AMERICA**

**v.**

**CK Chikong Tran**
**Defendant.**

**Case No.: 4:23-cr-00383-CLM-NAD-8**

**JUDGMENT IN A CRIMINAL CASE**
**(For Offenses Committed On or After November 1, 1987)**

The defendant CK Chikong Tran was represented by Alison Wallace.

The defendant pled guilty to count 1. Accordingly, the court finds the defendant guilty of the following count, involving the indicated offense:

| Title and Section | Nature of Offense | Count Number |
|---|---|---|
| 18 U.S.C. § 1341, 1343, and 1349 | FRAUDS AND SWINDLES | 1 |

As pronounced on April 16, 2026, the court sentenced the defendant as provided in pages 2 through 6 of this Judgment. The court imposed the sentence is imposed pursuant to the Sentencing Reform Act of 1984.

The court ordered that the defendant shall pay to the United States a special assessment of $100.00, for count 1, which shall be due immediately.

The court further ordered that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this Judgment are fully paid.

**DONE** and **ORDERED** this 17th day of April, 2026.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE

CK Chikong Tran
4:23-cr-00383-CLM-NAD-8

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **TWENTY-ONE (21) months as to Count 1.**

The court makes the following recommendations to the Bureau of Prisons:

1. The defendant undergo medical assessment for placement with BOP.

The defendant shall surrender for service of sentence by noon on June 8, 2026 to the institution designated by the Bureau of Prisons.

CK Chikong Tran
4:23-cr-00383-CLM-NAD-8

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **36 months as to Count 1.** The Probation Office shall provide the defendant with a copy of the standard conditions and any special conditions of supervised release.

## STANDARD CONDITIONS OF SUPERVISED RELEASE

While the defendant is on supervised release pursuant to this Judgment:

1) You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of the time you were sentenced (if placed on probation) or released from custody (if supervised release is ordered), unless the probation officer instructs you to report to a different probation office or within a different time frame.

2) After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when to report to the probation officer, and you must report to the probation officer as instructed.

3) You must not commit another federal, state, or local crime.

4) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified, for the specific purpose of causing bodily injury or death to another person, such as nunchakus or tasers). Revocation of supervision is mandatory for possession of a firearm.

5) You must not unlawfully possess a controlled substance.

6) You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court. You must contribute to the cost of drug testing unless the probation officer determines you do not have the ability to do so. Based upon a court order entered during the period of supervision for good cause shown or resulting from a positive drug test or evidence of excessive use of alcohol, you shall be placed in the Substance Abuse Intervention Program (SAIP) (or comparable program in another district).

7) You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

8) You must follow the instructions of the probation officer related to the conditions of supervision.

9) You must answer truthfully the questions asked by the probation officer.

10) You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must

notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change. (If you have been convicted of a crime of violence or a drug trafficking offense, the probation office is responsible for complying with the notice provisions of 18 U.S.C. § 4042(b) and (c) if you change your residence.)

11) You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

12) You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment, you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as the position or the job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

13) You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

14) If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

15) You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

16) If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk, and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

17) You must fully and truthfully disclose financial information as requested by the probation officer related to the conditions of supervision. Financial information may include, but is not limited to, authorization for release of credit information, bank records, income tax returns, documentation of income and expenses, and other financial information regarding personal or business assets, debts, obligations, and/or agreements in which the defendant has a business involvement or financial interest.

18) You must support all dependents.

CK Chikong Tran
4:23-cr-00383-CLM-NAD-8

19) You must comply with the probation office's Policies and Procedures Concerning Court-Ordered Financial Obligations to satisfy the balance of any monetary obligation resulting from the sentence imposed in the case. Further, you must notify the probation officer of any change in your economic circumstances that might affect your ability to pay a fine, restitution, or assessment fee. If you become more than 60 days delinquent in payments of financial obligations, you may be: (a) required to attend a financial education or employment preparation program under the administrative supervision of the probation officer; (b) placed on home detention subject to location monitoring for a maximum period of 90 days under the administrative supervision of the probation officer (and you must pay the cost of monitoring unless the probation officer determines you do not have the ability to do so); and/or (c) placed in a community corrections center for up to 180 days under the administrative supervision of the probation officer (and you must pay the cost of subsistence unless the probation officer determines you do not have the ability to do so).

CK Chikong Tran
4:23-cr-00383-CLM-NAD-8

**SPECIAL CONDITIONS OF SUPERVISED RELEASE**

1. You must cooperate in the collection of DNA under the administrative supervision of the probation officer.
2. You must participate in a mental health treatment program under the administrative supervision of the probation officer, and you must comply with the requirements and rules of the program. You must contribute to the cost of treatment unless the probation officer determines you do not have the ability to do so.

Doc. 286

Transcript of Sentencing Hearing

FILED
2026 May-01 AM 11:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

4:23-cr-00383-CLM-NAD-8

UNITED STATES OF AMERICA,
Plaintiff,
vs.

CK CHIKONG TRAN,
Defendant.

---

# OFFICIAL TRANSCRIPT OF SENTENCING HEARING
ANNISTON, ALABAMA
APRIL 16, 2026

BEFORE THE HONORABLE COREY L. MAZE
UNITED STATES DISTRICT JUDGE

FOR THE UNITED STATES:
JOHN HUNDSCHEID
U.S. Attorney's Office
400 Meridian Street
Suite 304
Huntsville, Alabama 35801

FOR THE DEFENDANT:
ALISON WALLACE
Attorney at Law
P.O.Box 36926
Hoover, Alabama 35236

U.S. PROBATION OFFICER JENNIFER DUPUY

COURT REPORTER:
Carrie M. Robinson, RMR, CRR, CRI
Federal Official Court Reporter
1729 Fifth Avenue North
Birmingham, Alabama 35203
(205)278-2063

(Proceedings recorded by mechanical stenography. Transcript produced by computer-aided transcription.)

P R O C E E D I N G S

April 16, 2026 1:53 p.m.

THE COURT: This is Case Number 4:23-383, United States versus CK Tran. Mr. Tran is here with us today.

Who is here on behalf of Mr. Tran?

MS. WALLACE: Alison Wallace for Mr. Tran.

THE COURT: And who is here for the government?

MR. HUNDSCHEID: John Hundscheid for the United States, Your Honor.

THE COURT: All right. Good afternoon to you-all.

So this is one of our six sentencing hearings today on the conspiracy case involving the Noir Organization refund fraud scheme. I have considered lots of documents and other things in considering today's case, so let me run through them before we get started.

In compliance with Booker, I have read and considered the sentencing guidelines and taken them into account on the issue of the appropriate sentencing guideline range. In that regard, I note that Mr. Tran in his plea agreement waived any right for a jury to determine the facts of his case in accordance with Booker and he admitted certain facts that bear upon the computation of his offense level under the guidelines.

I have also read the PSR, Ms. Wallace's objection to the PSR, the government's omnibus sentencing memo, the

government's updated calculation of the offense levels, and I discussed the updated calculation with all attorneys on the record yesterday. I have read Ms. Wallace's sentencing memo and the letter from Mr. Tran's brother in preparation for today.

Ms. Wallace, did you have at least 35 days in which to review the presentence report?

MS. WALLACE: We have, Your Honor.

THE COURT: Very good. Obviously, you did file objections. The objections I had, at least in your initial document, are the calculation of the time range of Mr. Tran's participation and, based on what we decide on the time range, whether or not there were ten or more victims related during that range.

I do understand that you and Mr. Tran have other objections that you would like to orally make today, correct, Ms. Wallace?

MS. WALLACE: That is correct, Your Honor.

We would also like to object to the sophisticated means -- the two-point enhancement for the sophisticated means.

THE COURT: Very good. So here is how we are going to do it today: Rather than just do it, like, objection by objection like normal, I am going to walk through how we calculate the offense level in this case. And as we go to

each one, I will just ask you whether you object or not. And if you do, I will let you state the objection. And I will let the government respond, and then I will make a ruling on each one, including the three that we have mentioned.

Before we do that, I want Mr. Hundscheid to go first because, at least in the written form -- and I know we are going to get into sophisticated means too, so I want you to include that -- but I want you to give me an overview of the evidence in the record about the start date of Mr. Tran's involvement with either Noir or Noir's Organization and the specific involvement that he had, including what means, because you know that we are headed toward sophisticated means, what specific actions that Mr. Tran took that you believe, sort of, roped him in with Noir's Organization and would be allowable to consider as a sophisticated mean that was used as part of the organization.

MR. HUNDSCHEID: Yes, Your Honor. I will start with just a brief overview of the methodology of how the loss amount was calculated.

THE COURT: Okay.

MR. HUNDSCHEID: As the Court is aware, there are order sheets that are referenced in the plea agreements that are stored both in Google Drives and then a project management tool called ClickUp. Those were recovered from conspirators' accounts through a search warrant. The FBI did analyze that

data and built a spreadsheet which is essentially a summary of all the orders that are reflected in those documents.

In my view, it is an incredibly conservative estimate because it is gravitated towards December of 2021, and so we are capturing a snapshot in time of the loss amount, really, and not a true reflection. So I think that methodology is a conservative estimate that the Court could be comfortable on relying on for purposes of the guideline calculation here.

So those losses show about 1.1 million from the Google Sheets and about 600,000 from ClickUp. Roughly speaking, August of 2021 is where the Google Sheets start, and then they end in February of 2022 at which point the ClickUp orders pick up for the next few months.

THE COURT: What was the start date for Google?

MR. HUNDSCHEID: I can -- if you will give me one second, Your Honor, I will tell you the exact date it is, but I believe it is in August of 2021.

THE COURT: Okay.

(Brief pause)

MR. HUNDSCHEID: It is August 21st, 2021.

THE COURT: Okay. All right. The reason I want to start here is the PSR has Mr. Tran's involvement starting in November of '22. And Ms. Wallace's memo I think had it later into 2022. But your omnibus motion, the one that I am making

my notes on, indicates that you have evidence that it was as early as March of 2020. So go through with me what evidence you say indicates that Mr. Tran was connected to Noir's Organization before August of 2021 when the calculation of the loss occurred -- starts.

MR. HUNDSCHEID: Yes, Your Honor. So as the Court referenced in the sentencing memo the government has filed, there are Telegram chats that came from a consensual search of Mr. Tran's Telegram account following his arrest which I think is the subject of, perhaps, the confusion about when the start dates started because a review of those materials show that the relationship was even longer back than was initially thought through the preindictment investigation.

So what is contained on page 16 of the government's sentencing memo are screenshots from that Telegram chat. Telegram is, unfortunately, not a very friendly platform to work with, so the FBI computer scientist wrote a SQLite database that pulls the messages out in this format. And what you see in that first message on the top of page 16 is a series of messages in late -- mid to late March, 2020, where the user Radiant, who is Mr. Tran, is representing himself out as an admin of a Noir chat and also an admin of other chats like AIO, which -- and some other groups, Your Honor.

And then in that second message -- or, again, around the same time of March of 2020, you see Mr. Tran tell another

user Noir -- Noir referred you to me because I am looking for a drop service and we also work together.

So, again, that shows that partnership as far back as 2020 as well.

Finally, one more from early March of 2020, you can see somebody messaging to the Radiant account saying, I have reached out to Noir a few days ago, and I am still waiting on the 50 percent partial refund. I wasn't too sure if I should message an admin to get help or not.

So I think all of that shows that Mr. Tran is involved with Noir as far back as March 2020 to the point of if users are having issues with a refund, they are reaching out to him and identifying him as an administrator of the channel.

So given that relationship, I think it is safe to attribute all of the losses that the government has been able to establish here from that August 2021 into the spring of 2022 because we can show that Mr. Tran's relationship with Noir predates even the charged conspiracy in the indictment, Your Honor, and actually extends back further than that.

THE COURT: All right. Before you sit down, Mr. Jones, I am going to need you to leave for about two minutes.

Sam, I will just tell you to go get him.

MR. JONES: Yes, sir.

(Courtroom cleared)

THE COURT: All right. For record purposes, the reason I did that was to ensure that the only persons in the room are related to this case or court personnel.

I also know from reading the government's 5K motion that Mr. Tran was instrumental in identifying and locating Noir himself. If you could, go through the evidence that was received by the government from Mr. Tran regarding Mr. Noir and their relationship.

MR. HUNDSCHEID: Yes, Your Honor. Mr. Tran was, as the Court said, instrumental in finding Noir. We wouldn't have done that and indicted him without the information that he provided. And that comes from the relationship that Mr. Tran had with Noir that was different than other people that are involved in this case. They gave us good leads. Specifically, Mr. Tran had interacted with him on platforms other than Telegram, which is critical for an investigation like this because at that time, Telegram was not responsive to law enforcement requests. And so the best -- somebody who is cooperating who can talk to Noir on Telegram, that doesn't get us anything as investigators into attributing that account to a particular person.

But Mr. Tran identified on his own volition when we explained what we were looking for two specific facilities that Mr. Noir -- Mr. Noir -- Mr. Ahmad, Noir, used,

specifically a Steam account that he had interacted -- that Mr. Tran had interacted with Noir on and then also a Snapchat account.

So legal process was issued for both of those facilities. When we got the search -- when we got a -- I think it was a 2703(d) order back on the Snapchat account, the registered email was an email we had seen in this investigation that had touched the spreadsheets which led us to know that what Mr. Tran was saying was truthful and reliable because we confirmed it through a another mechanism.

THE COURT: How far back do those communications on Steam and Snapchat go, and do any of them have anything to do with refund fraud?

MR. HUNDSCHEID: No, Your Honor. They don't have anything to do with refund fraud. There is no way to really know based on what was left in the account. So we are very, very fortunate because in the spring of 2023, the Steam account was deleted, which I have theories about why that might have been, but -- so there were very limited records that were available to it. But there were a series of email addresses that had been used on the account before. And because there's a level of separation between a Steam account that Noir used to play games with Mr. Tran rather than commit fraud, there's less operational security that's tied to there.

And so there's an email account that's tied to that

Steam account which we were able to pivot off and then identify personal accounts related to Noir.

THE COURT: All right. Before I move on to Ms. Wallace, what contributions did Mr. Tran make to Noir's Organization separate and apart what he did for himself? In other words, not looking at Radiant's Refunds but looking specifically at Noir's Organization, what did he do and what method did he use to do it on behalf of Noir?

MR. HUNDSCHEID: Yes, Your Honor. I wish -- if I were aware that we were arguing sophisticated means, I would have spent more time in the chats and identified --

THE COURT: Well, I am sure they are going to have a lot to say and you can look into it.

MR. HUNDSCHEID: Yes, Your Honor. But the specific one that, I assume from what Mr. Tran handed me, we are going to talk about is that he was providing advice on which refund fraud methods work and don't work. And so on page 6 of the government's omnibus sentencing memo, you can see the user Radiant providing advice about Apple's fraud detection prevention systems and how they work and indicating that he is testing them and is providing that information.

I would say that that is illustrative of Radiant's contributions to these chats. He is a consultant and somebody who would distinguish himself from the workers.

So he is not a refunder. He is an ideas guy or a

bigger-picture person, and he's providing information like this. Like, this particular technique works, or this particular technique doesn't work, or this is what the retailers do or don't do to combat these fraud techniques.

So I think the chat that's screenshotted on page 6 is a good representation of the other, sort of, conduct that is in the chat.

THE COURT: Very good.

All right. Ms. Wallace, again, base offense level is 7. That's not contested. The first thing that is contested is the loss amount attributable to Mr. Tran under 2B1.1(b)(1) being 1.69 million. And the reason that that is contested is your disagreement with Mr. Hundscheid as to the appropriate range of time.

He says that -- Mr. Hundscheid, for the government, says that Mr. Tran should be attributed the time period -- the full time period of the loss which is August of '21 through the end of the Clickup, which is in 2022. And you would argue instead: What is the appropriate time to start Mr. Tran's involvement and why?

MS. WALLACE: Well, Your Honor, I know you have read my sentencing memorandum that gives my dates, and I think Mr. Tran would like to address the Court on that, if that's all right with the Court.

THE COURT: Yes, that's fine, Mr. Tran. And the

place to start is going to be with the Telegram messages that Mr. Hundscheid points out which would indicate that on Telegram, as early as March of 2020, you were holding yourself out to others as being an admin of Noir's chat and Noir's market. So if this is true, that these are your Telegram messages and you are holding yourself out to be an admin of Noir's market, what would the argument be that you are not coordinating with Noir before August of '21?

THE DEFENDANT: Hi, Your Honor. I would like to explain that.

THE COURT: Okay.

THE DEFENDANT: And before I do, I thought I would also need to further give more context as to why I put it on Telegram in the first place because it is in direct relation to everything else.

THE COURT: Okay.

THE DEFENDANT: So in terms of --

THE COURT: Can you -- before you -- can you pull the microphone up?

THE DEFENDANT: Yeah, okay.

THE COURT: There you go.

THE DEFENDANT: It should be noted that this started around the beginning of COVID, so around, like, between January and March of 2020. And if you were to look at Exhibit C, this -- it would contain chat logs between me and

this person that I was in a long-term relationship with where she pretended to be a human trafficking victim to steal from me. And so that defines my motivation in terms of why I needed to, like, find a way to come up with the finances to help her.

And if you were to look in one of the screenshots, more like several of them, you would see that the timing of those messages would be either on January or March of 2020.

THE COURT: Of which year, 2020?

THE DEFENDANT: Yes, correct.

THE COURT: Okay.

THE DEFENDANT: Around that time frame.

So the reason why I am noting this is because it defines my motivation in terms of how I appeared on Telegram in the first place.

THE COURT: Okay.

THE DEFENDANT: So after that fact, of me actually appearing on Telegram, I -- what I did was I established myself in a chat room, and eventually, that led to me being an admin across multiple groups.

THE COURT: Well, why is she saying that you owe her money?

THE DEFENDANT: That is not -- I did not owe her money. I believe she might have just, like, typed something wrong. But, overall, essentially, she -- the narrative was

that she was being human-trafficked, and she wanted my help.

And so that was my motivation in terms of trying to find finances to achieve that purpose.

THE COURT: So it says, It looks like you are done with her. She is in good hands. Once her debt is cleared, we will send her back to the U.S. When she is back, you can ask her.

THE DEFENDANT: Correct, yes. So that message was someone on her account pretending to speak on her behalf, or it was her posing as a captor reaching out to me or responding to me.

THE COURT: Okay. All right. Go ahead.

THE DEFENDANT: Okay. Yeah.

So in terms of my role on Telegram, because I -- because I spent my time just casually communicating in these groups and just, like, building her persona, I -- eventually, I became one of, like, quote, unquote "super-admins" on the platform, meaning I had access to banning over 50 -- like, banning users in over 50 groups just by, like, one command on the Telegram platform itself.

And so this can be seen in Exhibit D which -- in which I had access to an admin group chat where I -- where I use it to, like, ban users.

And yeah, so basically, the reason why I bring this up is because it is in relation to my comment about me being

an admin in Noir's group. And if you were to pay attention to each and every one of those messages, I don't only name Noir's group. I name several that I was an admin of, but not limited to them.

THE COURT: Well, let me ask you: Have you got that page in front of you?

THE DEFENDANT: Yeah.

THE COURT: That page 16?

Look at the bottom one. It says, Hey, Radiant. I reached out to Noir a few days ago. Still waiting on the 50 percent partial refund. I wasn't too sure if I should message an admin to get help or not.

THE DEFENDANT: Uh-huh, yeah.

THE COURT: And then I am assuming that is your response: I checked your case?

THE DEFENDANT: So what I am bringing up is actually regarding the top of page 16 in which I name --

THE COURT: Yes, but I want you to answer the bottom.

THE DEFENDANT: Oh, okay. Got it. So --

THE COURT: It says, I checked your case, and you messaged Noir five hours after the 24 hours, so you are not applicable for a refund.

THE DEFENDANT: Yes. Please give me, like, one minute -- just a few seconds while I find the reference for

this.

THE COURT: That's fine.

(Brief pause)

THE DEFENDANT: Yeah, so if you were to look on Exhibit G, this would be the full chat log of the conversation itself. And given the context of the full chat log, I was -- it explicitly shows that I was not actually -- I was not actually working for Noir, nor was I handling his refund customers.

THE COURT: Then why would you say you checked his case; he messaged five hours after the 24 hours, so you are not applicable?

THE DEFENDANT: Right.

THE COURT: Why would he be coming to you about a 50 percent partial refund and you checking the case and determining he is not eligible?

THE DEFENDANT: Yeah, so that would be -- so it is important to pay attention to the context of the chat log itself.

THE COURT: Well, I want to pay specific attention to this conversation.

THE DEFENDANT: Okay.

THE COURT: Someone reaches out and asks you why he hasn't gotten the 50 percent refund. The first question is: Why would you be getting asked why Noir isn't giving a refund?

Why does that person think that you are the person to ask?

THE DEFENDANT: Okay. Yeah. So that would be in direct relation to the fact that I am an admin in multiple groups. So he was coming to me to file a scam report on Noir, basically. And then, essentially, I wasn't really aware of the situation, as the chat log indicated. And based off of the message that the user sent me, that's what I forwarded to him and showing him, like, based off of what Noir said that the case, in his situation, would not -- he wouldn't be able to get a refund because of that. And I did tell him to just take it up with Noir himself because I actually had no idea what the situation was. And it just didn't have anything to do with me at all either.

THE COURT: Okay.

THE DEFENDANT: And that is explicitly stated at the top of the messages in the chat log.

THE COURT: All right. Go ahead.

THE DEFENDANT: Yeah, so just going back to the top of page 16 in terms of where I named myself an admin, I did name myself an admin of multiple groups in each and every one of those messages, so the -- but the point I'm making is that, given the full context of those messages, I was not actually stating that in order to, like, you know -- so the reason behind I -- I made those messages was to actually promote my own refund service at that time, around March 2020. And so --

THE COURT: What was your group doing?

THE DEFENDANT: Around that March 2020 time, I had my own refund service.

THE COURT: Okay.

THE DEFENDANT: Which was separate from Noir's, completely unrelated to it.

THE COURT: But you were an admin of Noir's?

THE DEFENDANT: Yeah, I was an admin with Noir's group, along with many other groups.

THE COURT: Okay.

THE DEFENDANT: Either -- like, unrelated to refunds, and there were a couple of various different group types, being like trading, crypto services, and just many different categories.

THE COURT: Okay.

THE DEFENDANT: Okay. So in the middle of the message in which I state that Noir and I work together, I actually stated that in a different context.

THE COURT: What page and exhibit are you on?

THE DEFENDANT: So the exhibit for this would be on Exhibit F.

THE COURT: Okay.

THE DEFENDANT: And given the full context of the chat log, I was actually asking for a job service, and it was actually something that another Telegram user wanted me to

source information for him, and that's what I did. And I just felt that because he was Noir's referral, if I just stated that directly, it would just, like, clear up the confusion and just get to the point.

As you can see through the chat log, nothing actually came out of that conversation, and I just didn't want anything to do with it. So I just like got rid of the conversation with him from that point on.

THE COURT: Okay.

THE DEFENDANT: And so it did not signify anything of me actually working for Noir, nor does it really show any type of business agreement that we had, nothing of that sort.

Now, in terms of my relationship with Noir himself and my -- and the scope of my involvement, to start off, Noir and I were just friends on a personal level, and I was detached from him in terms of any type of, like, business relationships because I just simply did not like his business acumen at all, and that can actually be shown in further chat logs down the road.

But overall, when it comes to the dynamic that Noir and I had in terms of me being affiliated with his groups on Telegram, basically he had a pattern of just repeatedly dropping me in them without my consent, and I -- and this could be seen in Exhibit G where Noir -- where a chat log is shown. And this was in the group Telegrams, or something Chat

Box, something -- that was probably the group name, but basically, Noir -- you can see that Noir tagged me and says, like, Trolololol, and then I respond by calling him an expletive and saying that he dropped me in the groups again, essentially.

And so basically that interaction will show that he did things just to annoy me for fun, and I simply did not like it nor did I expect it. But nonetheless, I did remain in those groups, though.

But in reference to that, my activity in those groups has always been strictly limited because I was not part of operations, and I did not actually say anything unless Noir asked. And during those moments where he would ask, it would always be about me just giving him very general feedback in terms of what I did notice or have seen.

And so in those moments, I would give him mainly just criticisms about his business and, like, his business acumen and why things were not working, and they were not -- they weren't, like, directed marketing advice or anything of that sort. It is more of criticism in nature.

THE COURT: Did you ever stop to think that when you were criticizing and helping him understand why he was performing less than optimal that you were helping someone commit a crime? I mean, you had to know that this was refund fraud and it was criminal and you were helping someone --

conspiring with someone to commit criminal conduct.

THE DEFENDANT: During those moments when he asked me for business advice, it was more about just, like, what was the best way to actually find leads and stuff.

THE COURT: But that doesn't change my question. He's asking you, How can I find leads to commit criminal conduct? I know that you, personally, Mr. Tran, or Radiant, are committing criminal refund fraud. How can I commit criminal refund fraud better?

You had to understand that's what was going on.

THE DEFENDANT: So I can answer that in two parts. So --

THE COURT: Well, the first question is yes or no. Did you understand that you were committing criminal refund fraud and assisting someone else to do the same thing better?

THE DEFENDANT: I would say that in those moments when he asked me those questions, I gave him criticisms knowing that he was committing refund fraud, but in terms of the way that I actually structured my responses to him as such, it was not to actually help him actually carry out his plans but rather just, like, criticize his business acumen in terms of the way that he did run his businesses.

Outside of Telegram -- I don't have the chat logs anymore, but there was a point where Noir actually opened a Shopify account to create a legitimate business for

e-commerce. And at some point, he wanted me to mentor him for that. However, he decided that it was not a profitable venture for him, and he just wanted to just continue his ventures on Telegram. And my relationship with him in terms of my dislike for his business acumen is actually shown across -- I am showing exhibits that demonstrate that.

THE COURT: Okay.

THE DEFENDANT: So in terms of me criticizing his business acumen in general, it covers both fronts. When I did not like his -- the direction that he took, being I preferred him to stay off of Telegram, but in spite of that, based off of his actual business acumen on Telegram, it was not something that was -- that was something sufficient in order to create happy customers as a general business principle, and that's something that I did let him know.

THE COURT: Explain to me Exhibit E.

THE DEFENDANT: Please give me a second while I find that.

THE COURT: It is the one about Walmart pickup fraud. You are -- at this point in March of 2020, you have posted Radiant's Elite Refund Service, up to $15,000 order limits, and someone is asking you about Walmart refunds.

THE DEFENDANT: Give me a second, please.

THE COURT: That's fine. It looks like this (indicating).

THE DEFENDANT: Oh, okay.

(Brief pause)

THE DEFENDANT: Right, okay. So that exhibit was actually one of the chat logs that was used in the government's sentencing memorandum, and the full chat log of that is basically me advertising my own refund service and leveraging the fact that I was an admin in multiple different types of groups to achieve that purpose.

THE COURT: Yeah. You were using your connection with Noir, AIO, Moonlight, and KiKi to say, I am legit, because he had accused you of being a scammer before that. And you are like, I can't be a scammer because I am an admin of four of the biggest groups. That is the context of what Mr. Hundscheid was pointing out.

THE DEFENDANT: So it does not explicitly point out that I worked with Noir or had any type of business relationship with Noir. What it does show is that I was an admin of multiple groups in which I leveraged -- I leveraged that reputation to secure business for myself.

THE COURT: Okay. At the end of these messages, you tell him to check your vouches if you want assurance. He says, Send me your group. And one of the four links that you give him is NoirThePlug.

Explain to me why you have an account within Noir called NoirThePlug.

THE DEFENDANT: Can you repeat the question?

THE COURT: Yeah. You can see at the end when this person says, Send me your group, you are trying to give yourself creditability.

THE DEFENDANT: Okay.

THE COURT: He says, Send me your group, and the fourth of the links that you send is tagged at the end "NoirTheplug," which to me indicates that you have a Noir account called "ThePlug."

THE DEFENDANT: No. So NoirThePlug is actually Noir's own account. So basically what a vouch meant on Telegram is that -- it is such that if you are not a person that is -- if you are not a scammer on Telegram, meaning like you offer a service and you fulfill that service, then you are not a scammer, and therefore, you would be vouched for carrying out a service.

THE COURT: Okay.

THE DEFENDANT: So a vouch does not really represent any type of, like, partnership with any type of user. It is just -- it just points out that this person offers a legitimate service, and he won't run away with your money. That's what it means.

THE COURT: But you are doing that by linking yourself to Noir. The evidence that you are giving this person that you are legitimate and not a scammer is by saying

that I am connected to Noir.

THE DEFENDANT: During that time when it comes to --

THE COURT: Well, before "during that time," did what I say -- is what I am saying correct, that when pushed to show that you are a legitimate refund service, you say, Click NoirThePlug to see that I am connected to Noir which is a legitimate, recognized refund service?

THE DEFENDANT: No. So NoirThePlug was actually just an account. It is not a -- NoirThePlug, it was just an individualized Telegram account that Noir had.

THE COURT: For whom?

THE DEFENDANT: Noir himself owned several Telegram accounts, and that was one of them.

THE COURT: So if this person clicked it, what would he or she see?

THE DEFENDANT: He would have seen a -- some type of channel and then, like, a list of, like, users that were quote, unquote, "vouched."

THE COURT: Including yourself?

THE DEFENDANT: Yes. And that vouch list would be sourced from different Telegram groups as well because they just copy each other in terms of the term ring, which people -- which people would have legitimate services that they wouldn't run away with.

THE COURT: So you are using Noir as a vouching

service for you because Noir lists you as someone that it is giving credibility to as a refund service.

THE DEFENDANT: When it comes to vouches on Telegram, when you are vouched in one group, a user can take that and also list you as a vouch in multiple groups. So when it comes to vouches, it does not signify any type of business partnership. It is just a determinant that this person is in this group, and he does not run away with people's money.

That's all it stands for, and it doesn't -- it doesn't signify any type of, like, business agreement nor any type of, like, financial benefit to Noir himself.

This vouch system is actually a very common thing on Telegram across groups, and the way that I used it was to show that I had vouches across multiple groups because I was an admin with them. And on top of the fact that I was an admin, I was not going to just run away with people's money. That's what that -- the chat log shows.

THE COURT: Who made the decision to make you an admin of Noir's group?

THE DEFENDANT: When it comes to that decision, Noir made that decision himself.

THE COURT: Why?

THE DEFENDANT: He -- that is a little bit hard to answer because --

THE COURT: Why do you think?

THE DEFENDANT: Yeah, so Noir and I made each other admins in each other's groups even if they were not -- even if they were unrelated to anything that was fraudulently related.

For instance, I own a stock channel on Telegram, and I also made Noir an admin in there. And Noir actually had a history of just making random friends admins in his groups, and I was not the only one of them.

And when it comes to his groups, I actually have highly limited messages -- message volume, so it -- there's no actual bearing in terms of my business relationship with Noir based on admin status.

THE COURT: When was the first time that he ever asked you for your advice on how to provide a refund service?

THE DEFENDANT: This would be found on -- can you give me a second while I reference my documents?

THE COURT: Uh-huh.

(Brief pause)

THE DEFENDANT: The first notion of this would be found on February 4th.

THE COURT: Y'all can get Mr. Jones back. I forgot -- go ahead.

THE DEFENDANT: This will be shown on -- give me a second.

I have the exhibit for this. I just need to reference it properly.

So this would be found on Exhibit B. You can see that I expressed what does not work for Apple refunds on February 4th, 2022, and what may work for Samsung on March 30th, 2020.

And then --

THE COURT: Let's start over. All right. So it starts March 30th, 2022, on the back. So what is on the front page? The February 4th?

THE DEFENDANT: Yeah. So February 4th is in regards to Apple, the retailer Apple.

THE COURT: Okay.

THE DEFENDANT: And then on March 30th, that was in reference to Samsung. And so the way that I -- the way that I made these comments was in very casual conversation, but I fully accept responsibility that I should not have been in these groups, for one thing. And, secondly, I should not be saying anything in regards to any type of, like, methodology at all when it comes to refunding retailers.

THE COURT: And I know this isn't going to make sense to you, Mr. Tran, but I am going to ask Tori, if she's listening, to print off and bring me a copy of the plea agreement.

All right. Go ahead.

THE DEFENDANT: I also want to make it clear that when --

THE COURT: So you say -- before you go any further, you would say this is the first time that you ever gave Noir advice about some of the problems -- or gave him advice on how to make his organization better?

THE DEFENDANT: This was the first time in which I explicitly -- sorry, explicitly state anything that would actually be a determinant when it comes to possibly, like, helping Noir make refunds in any context.

So it's -- I believe that these messages were very objective in the manner in which I sent them because I should not have sent them in the first place, and it's -- they were very direct statements that I made in which would help -- help the Noir -- Noir's Organization, like, carry out their refund service in some shape or form.

But in terms of really determining the consequences of what I said or, like, the results from that, you can reference Exhibit A, which is the bottom of the Excel sheet, and you can see that from February 4th and March 30th, they did not -- they didn't conduct any successful refunds to the Apple or Samsung retailers. And the reason why I am bringing this up is because in relation to the comments that I made, there were no -- there were no financial benefits to Noir's Organization at all, and they did not carry out any type of activity based off of what I said.

Yeah, so on the order sheet, it typically lists the

date, the name, the account details, and the retailer information and the shipping status.

So from February -- from February 4th, 2022, onwards to the end of the Excel sheet, you can see that there was no actual results that came out of what I said.

THE COURT: Still, you are not convicted of success. You are convicted of conspiring to give them advice.

THE DEFENDANT: Yes, I fully understand this. I am just pointing out that what I said had no actual results on the organization itself.

THE COURT: Okay.

THE DEFENDANT: And that has always been the case in which Noir actually also -- there was a point where Noir actually stated that the information I gave him was not helpful and that, you know -- and that the things I would tell him usually would just be very negative and just -- yeah.

So if you will allow me to bring this up, so basically on Exhibit H --

THE COURT: Okay.

THE DEFENDANT: -- this is where Noir explicitly states that I never respond positively to what he does, and this will show that I lack the proper operational advice I could give him. And it can be seen explicitly in the chat log that he decided that he would need to come up with extra methods himself.

At some point in the chat log, he also states that my knowledge of his operations were also very outdated, and it also shows that further communications down that chat log of Exhibit G -- sorry, Exhibit H, it shows that I also gave him feedback on something that was also just recently released which also would lack results to actually determine how successful it was.

So, essentially, I lacked understanding of their operations in the first place, and Noir asked me to comment something that I didn't know about. But, nonetheless, because he asked me to comment, that's why I said the things that I did.

Yeah, so further down that chat log, which would be referenced in Exhibit I, it's Noir -- that chat log shows that Noir was -- Noir already had a system and plan in place, and he also names his operational partners that would be affiliated -- sorry -- affiliated with that in order to carry out the refund service, and I am not named at all.

THE COURT: Well, let me go back to the beginning, though. Who all was in this chat? It is obviously you, Noir, at least one other person who ultimately deleted the account before you --

THE DEFENDANT: Yeah.

THE COURT: -- printed this off and a person named Reign.

THE DEFENDANT: Right. So that chat log is -- the name of that group chat is Anime Fan Club Chat, and basically, it contained all the operational partners of Noir's Organization -- his workers, his marketers.

THE COURT: What was the name of it again?

THE DEFENDANT: Anime Fan Club Chat.

THE COURT: Spell that for me.

THE DEFENDANT: A-n-i-m-e.

THE COURT: Oh, Anime. Okay.

THE DEFENDANT: Yeah, Anime and then Fan Club Chat.

THE COURT: Okay. And you said this was all of the organizers of the Noir organization.

THE DEFENDANT: Yeah. Those were all the individuals that was part of Noir's Organization.

THE COURT: Why are you added to it?

THE DEFENDANT: Yeah, as mentioned prior, because Noir and I just had a distinctive personal relationship outside business, he just decided to just add me to his groups, despite me not wanting to be there.

THE COURT: But you are weighing in. You don't say, I don't want to be here. You are going back and forth with him about why his ideas are incorrect.

THE DEFENDANT: Correct, yes. So when it comes to the way that I was in groups, I did have -- I did initially leave them repeatedly, but then I was always just added back.

And so eventually there was just no point in leaving because I would just repeatedly be added back in the group. And this was just something that Noir did for fun. And so I -- I accept full responsibility of just talking in these groups when I should not have because I understand that I should not have been in there in the first place, and so -- yeah.

THE COURT: When do you remember first being added to his chat group of organizers that came up with ideas on new or better ways to commit refund fraud?

THE DEFENDANT: This was mostly -- sorry. Just give me a second, please.

MR. HUNDSCHEID: Your Honor, the chats start, that we have, at January 26th of 2022.

THE COURT: Okay.

MR. HUNDSCHEID: That's not to say there aren't previous chats, but what we have --

THE COURT: But it is the ones that you have.

MR. HUNDSCHEID: Yes.

(Brief pause)

THE DEFENDANT: The most notable chat log that I was in is exactly that, the Anime Fan Club Chat. And I believe that chat starts on January 31st, 2022.

THE COURT: Well, I mean, Exhibit H starts on January the 3rd, so it is certainly before January 31st.

THE DEFENDANT: Exhibit H.

THE COURT: The one that you just showed me. The very top says that Radiant responded to Noir on January 3rd, 2022, at 7:43 p.m.

MR. HUNDSCHEID: I think that is a quote of a previous message.

THE COURT: So it is even --

MR. HUNDSCHEID: So it is later.

THE COURT: Okay.

MR. HUNDSCHEID: But it is referencing a previous --

THE COURT: But it shows that he was at least part of a discussion with Noir --

MR. HUNDSCHEID: Yes.

THE COURT: -- as early as January 3rd.

MR. HUNDSCHEID: Yes. I was just clarifying when I said January 26th --

THE COURT: Understood.

MR. HUNDSCHEID: -- that's when this starts.

THE COURT: That's when this one starts.

MR. HUNDSCHEID: Yes.

THE COURT: Okay. All right. You can continue.

THE DEFENDANT: Yeah, so I never actually gave Noir any type of practical advice before the Anime Fan Club Chat. And the Anime Fan Club Chat is where I explicitly talk about the Apple and Samsung refund services.

THE COURT: Okay.

THE DEFENDANT: And other than that, it has always been just very casual conversation that were just criticisms of Noir's business acumen, and that generally has always been the case in terms of my relationship with Noir and his businesses.

So outside of Telegram, that's the actual relationship that I had with Noir which actually allowed me to play games with him on other platforms outside of Telegram, and that's how it always was.

But in terms of business, I did not like his business acumen. He always dropped me in the groups, and I eventually -- I just overstayed my welcome, and I ended up saying things I should not have.

THE COURT: Let me ask you this, Mr. Hundscheid: If I gave you more time, do you have any chats -- Mr. Tran's point about the March 2020 is he wasn't conspiring with Noir to further the conspiracy of Noir making money; he's puffing himself up by noting that I am listed as a user on Noir, so you can trust me.

I don't know that Noir gets any benefit out of that.

Do you have any chats or anything that would have Mr. Tran giving advice to Noir before January of 2022?

MR. HUNDSCHEID: So no, Your Honor. The chats start at January 26th which we have through a cooperator. We don't -- since we can't search Telegram, we don't have

anything further than that. But I would say Radiant's refund fraud group was also a large group.

THE COURT: But he wasn't charged with that.

MR. HUNDSCHEID: I agree, but I think there's cross promotion.

THE COURT: Okay.

MR. HUNDSCHEID: And so it was mutually beneficial to both of them to advertise them as associated with each other. I think even Mr. Tran has alluded to that. Like, that is why he is linking himself to Noir, and I do not believe Noir is altruistic. I think Occam’s razor says --

THE COURT: Of course. I don't either.

MR. HUNDSCHEID: -- the reason that he's doing that is to benefit from him.

THE COURT: Well, I think Mr. Tran would acknowledge that everybody posts each other's names to give all of themselves more credibility. The question is: At what point did Mr. Tran start offering some advice or service to Noir's Organization -- well, if I don't consider just literally having his name on their site as being offense conduct.

MR. HUNDSCHEID: I think that March -- the March 23rd, 2020, message on page 16 where it says, I checked your case, that's more than just --

THE COURT: Yeah. That's the one I keep going back to, Mr. Tran. And you really haven't answered my question on

that one yet.

If -- and we are going back to this (indicating).

THE DEFENDANT: Okay.

THE COURT: If you are not working with Noir or helping Noir with refund fraud, then why are you checking someone's case who reached out to Noir to get a 50 percent refund and didn't get it? Why would that person believe he should go to you? And, more importantly, why did you actually look into it?

THE DEFENDANT: That's a great question. So I would like to bring up the point, again, that I was a -- I was, quote, unquote, "a super-admin" across over 50 Telegram groups, so I basically received scam reports every single day. And I would ban users every single day. It was a very common thing. And that would also be in reference to the federal admin group that I showed previously in the exhibit in which it shows a -- it shows the chat log of just bans and bans and bans.

So in terms of in relation to that chat itself, he reached out to me because I was known to just ban users in general when it comes to handling fraud cases and, like -- scam cases, rather.

And so it did not signify -- it did not signify that I was working with Noir or aiding his service. It is more -- it is more about determining, like, what you just -- what I

should be banning based off of the fulfillment of their service in general. And --

THE COURT: But aren't you helping Noir by checking into the case and then defending Noir by saying that you are five hours too late and thus you are not applicable? It seems like you are doing Noir's work.

THE DEFENDANT: No, I was not defending Noir. I was just basically telling him what Noir said, and I told him to just reach out to Noir to handle that because I was not affiliated with that situation. And that's actually mentioned at the top of the chat log in which I state that I did not know about the situation, and it is rather clear that I was confused by the situation as well.

THE COURT: Where are you finding that at?

THE DEFENDANT: That would be at the top of the chat log itself.

THE COURT: Which exhibit?

THE DEFENDANT: Give me a second. Sorry.

(Brief pause)

THE DEFENDANT: That would be on Exhibit G.

One second. Sorry.

(Brief pause)

(Conferring)

MS. WALLACE: Judge, do you have two copies of the exhibits?

THE COURT: Of the exhibits?

MS. WALLACE: That Mr. Tran --

THE COURT: I have got "I." I have got two "I"s. I have got two Hs. I have only got one G, one F, one E, one D, one C, one A, and one B. So those are the only two I have -- but I don't think that either -- yeah, you can take those, but I don't think that they -- maybe this -- hold on. Here is an A, B -- maybe this one is it. Here's an extra D. Here's an extra C, F, G, and A.

MS. WALLACE: Thank you. Thank you, Judge.

THE COURT: While you look through that, Mr. Tran, I can ask you -- either you or Ms. Wallace. Exhibit D says that you are a super-admin with a dedicated group meant for banning users across 50 groups with a single admin command, which, again, leads me to assume that you are providing a service to Mr. Noir by banning users with a single command. You have been given admin authority, and you can ban users.

Am I misunderstanding your ability to ban users for Noir?

MR. HUNDSCHEID: Your Honor, I do think you are answering the question of what Noir gets out of his relationship with Radiant, right?

THE COURT: Yeah. I mean -- well, that's what I have always assumed that March the 6th of 2020 was is that somebody goes to Radiant to discuss a problem with Noir, and

Noir is checking to see -- I mean, Radiant is checking to see if Noir has done something wrong, the other person has done something wrong. Like, there is a -- there's obviously a relationship between Radiant and all of these others that have given him admin access. He's providing some service.

(Conferring)

THE DEFENDANT: Your Honor, I feel -- I believe I am missing the exhibit for that chat log that references the thing about -- the thing about the person reaching out to me about his case.

THE COURT: Okay.

THE DEFENDANT: But in terms of just answering your question about just banning users, I frequently did this on a daily basis, irrespective of who I had communications with. And it was just purely based off of the fact of whether someone just offered a proper service or not. And I would not actually -- I wouldn't actually need to know whether -- what the service was or not. Just based -- just based off of whether they actually sent money to the person and whether the service was fulfilled, and that was it.

There is no actual relationship between me and Noir based off that fact, and it does not signify that I was actually working for him. Because if he actually banned a user -- I mean, sorry. If he actually took someone's money and did not fulfill a service, I would have actually had to

ban him in the first place.

If you reference -- if you reference back to the chat log itself, what I did was I quoted what Noir had said, and then I told -- I then -- and then I told him just to reach out to Noir directly.

And that's --

THE COURT: But, again, if you checked -- "I checked your case," that means you communicated with Noir about a Noir case, correct?

(Conferring)

THE DEFENDANT: That was about Noir's case, correct.

THE COURT: Okay. And Noir told you that this person messaged him five hours after the 24th so he couldn't get it.

So you are -- this person is reaching out to you as an admin to determine why Noir hasn't worked with him.

THE DEFENDANT: He reached out to me because he was unhappy about Noir's service that he provided, and he felt that he -- he felt that -- he felt that Noir was not providing him proper service. And what I -- what I did was I sent him a message that Noir had sent, and then I forwarded it to him. And I told him that -- I told him to just refer to Noir for it and that I was not affiliated with the situation. That was what the -- that was the situation of that chat log.

THE COURT: But -- and this is the last time I am

going to ask, but why would this person come to you? If this person has a problem with Noir's service, and he says, I wasn't too sure if I should message an admin, but then decides to, why are you the admin that a customer or a user of Noir's service, why are you the person that he comes to?

THE DEFENDANT: Yeah, so I was -- I had a reputation across groups, and I was a known admin. So then I was -- so basically I was the easiest person to come to because I was the most responsive to situations regarding unfulfilled services.

And so because of that, typically people just reach out to me as opposed to someone else. I was just typically the most responsive person on the platform.

And so there were many admins in Noir's groups, and I was just the one that he decided to just reach out to. And I don't believe that he reached out to me off of Noir's group either. He -- at that time, he actually contacted me off of an unrelated group that he knows I was an admin in, and so he just decided to just message me because of that.

THE COURT: But he is still asking you about Noir. He specifically references Noir.

THE DEFENDANT: He does specifically reference Noir in terms of his business agreement with Noir. That's what he was reaching out to me about because of his -- of the lack of fulfillment of his service from Noir.

THE COURT: Okay. And you would have known at that point when you sent that message in March of 2020 that Noir was participating in illegal refund services, correct?

THE DEFENDANT: At that time, I -- I knew that Noir was offering a service, but I did not --

THE COURT: A refund service.

THE DEFENDANT: Yes. I knew that --

THE COURT: Similar to yours.

THE DEFENDANT: At that time, I -- I had knowledge that Noir had a refund service.

THE COURT: For offering refunds.

THE DEFENDANT: Yes, yes. I acknowledge that he was offering a refund service, but I did not know anything beyond that fact in terms of, like, which companies he targeted, nothing --

THE COURT: It doesn't matter which companies. You knew what he was doing, correct?

THE DEFENDANT: I knew what he was doing, but --

THE COURT: And you knew that some company -- you didn't know which one, but you knew or could at least reasonably foresee that some company was going to lose money, correct?

If this refund went through, you knew that a company would lose money, correct?

THE DEFENDANT: If that -- if that refund went

through, I -- it would be to my understanding that money would be lost to that retailer.

THE COURT: Okay. All right. I am going to sustain -- not sustain. I am going to overrule the objection as to loss amount because, again, I am looking at 2B1.1, and actual loss means reasonably foreseeable pecuniary harm that resulted from the offense. And if Mr. Tran is acting as an admin with reasonably foreseeable knowledge that Noir is committing refund fraud and a company could lose money at that moment, then as soon as March of 2020, he knew that it was reasonably foreseeable that companies were losing money based on Noir's activities.

So anything from that point forward would have been reasonably foreseeable. As Mr. Tran just acknowledged, he understood what Mr. Noir was doing, and he -- it would have been reasonably foreseeable to him that Noir was taking money from companies on refund fraud. So I am going to add the 16 there and then move into the sophisticated means.

Ms. Wallace, what is your objection to the sophisticated means addition?

MS. WALLACE: Your Honor, may I also let Mr. Tran address that?

THE COURT: You may.

All right. Mr. Tran, why would you say that what you did -- and it is two separate questions.

Why would you say that what Noir did in general was not sophisticated, and why would you say that what you were offering, particularly when you are discussing or strategizing on how to deal with Apple and other companies, how is that not sophisticated?

THE DEFENDANT: So the sophisticated means that was referenced in the presentence report was about the uses of Telegram itself.

THE COURT: Okay.

THE DEFENDANT: And Telegram is just a general social media platform, and it -- while it does contain privacy features --

THE COURT: Why do people use Telegram as opposed to something else?

THE DEFENDANT: That was something that I have not been really familiar with. It was just that I was Googling, like, ways to make money online, and I found myself on Telegram.

THE COURT: You do understand that Telegram is harder for the government to trace, correct?

THE DEFENDANT: I -- that was not to my knowledge. It was just the fact that I needed -- I needed to find a way to come up with finances at the time to help aid the situation based on the factor of the person being a human trafficking victim. And I needed to rapidly find a way to just come up

with finances. And it was not to my knowledge that Telegram was used for -- was explicitly used because it had any type of, like, perks to -- perks to that. It was just -- it was just, like, a popular social media platform to me, and then I found -- that I found myself having access to, and that was it. It doesn't have --

THE COURT: Can you point to me where in Exhibit C this person tells you to create a Telegram account?

THE DEFENDANT: Could you repeat the question? Sorry.

THE COURT: My understanding of what you are arguing is is this incident, when someone is essentially blackmailing you to save this female individual --

THE DEFENDANT: Yeah.

THE COURT: -- that you created a Telegram account.

THE DEFENDANT: Telegram is not mentioned anywhere in that chat log. It is just that because of the situation, I found myself on Telegram after that fact.

THE COURT: Well, you have got to give me a lot more explanation than that. You just don't find yourself on Telegram. Why did you move to Telegram?

THE DEFENDANT: Yeah, so from -- after that situation happened, I decided I needed to rapidly find finances, so I found myself on Telegram just by Googling ways to make money. And then what I found was that there were

just, like, groups that were advertising, like, marketing services and whatnot. And that's what I initially went off of when it comes to just, like, Google searches. And then once I found myself on the platform, I found these other groups that were on the Telegram platform itself. And so it was not really to my knowledge at all that -- that, you know, people used Telegram for any purposes. It was just, like, there were a lot of groups on Telegram where people can make money off of, and then that's -- that's how I found myself on the platform, and that's how I leveraged it.

THE COURT: Explain to me how refunding works, the way you do it and the distinction between what you did and what Noir did.

THE DEFENDANT: Okay. So in terms of refunding -- so I should make two points clear based off of, like, what I knew at the time.

THE COURT: No. That's not the question. The question is: Explain how it worked.

THE DEFENDANT: Okay. So the way that refunding works is that basically you take -- you take someone's order details, and then you would just get the order information from the account by logging in and then getting -- and then just passing that account -- the label -- passing the label on that account -- like, gaining that label that's associated with the order from that account and just giving it to someone

else for them to handle, and then that's the entire process of the refund.

And then when it comes to -- when it comes to what happens after you -- when it comes to what happens after the label was passed on to another person within Telegram, that is -- that part, I am not really too familiar with in terms of the process itself, just that the label is handed off to the person, and then that's it.

And I believe the second part of the question was how did Noir conduct his refunds; is that correct?

THE COURT: Uh-huh. For example, explain to me how refunding from Apple would work. If you wanted to purchase a product from Apple, how could you get a refund, keep the money and the product?

THE DEFENDANT: So the way to do that would have been to log into the account, get the label, have that label passed on to someone else on Telegram, and then they would do what they would need to do with that label in order to deal with the assurance process, I think. And then from that point on, that's when the refund successfully happens.

THE COURT: Okay. Explain to me in the Anime Fan Club Chat when it says Apple -- this is you talking: Apple has a system in place where if they detect a number of problems from the same number -- I am assuming that's credit card number, or account number?

THE DEFENDANT: Phone number.

THE COURT: Phone number.

THE DEFENDANT: I think.

THE COURT: Apple has a system in place where if they detect a number of problems from the same phone number, et cetera, they would be linked and inclined to fail.

Someone asked you -- Noir asked you, How did you figure it out?

I know that because I tested it across a few months, alternating between numbers.

Explain why you were testing Apple's system for detecting problems across multiple numbers.

THE DEFENDANT: That was actually a statement that I should not have made. I stated that just to, like -- just to be -- just to maintain communication in the group.

THE COURT: No, no, no. Explain to me why you were testing Apple's system of detecting phone numbers across several months, alternating between numbers. Why were you doing it?

THE DEFENDANT: I actually did not perform any tests. What I did was I took an information source from another group and then I passed it on to Noir's Organization group while saying that I did it myself.

THE COURT: You say that you tested using numbers across a few months. Did you actually do that?

THE DEFENDANT: I did not test that myself.

THE COURT: So you were lying?

THE DEFENDANT: I lied in the group in terms of what I did myself. That information was something that was confirmed by another user that I read in another group. And then what I did was I took that information, I mentioned it in Noir's group. And then rather than saying that that person tested it, I said that I tested it.

THE COURT: Where you say on the back of the page, EV works on Samsung, what is EV?

THE DEFENDANT: EV means -- it is, like -- that is the label thing. So, basically, it is known as boxing or something meaning like where a person would -- where a person would send, like, an empty box to a retailer to, like, get the refund. And that's -- to my knowledge, that is what would happen in terms of how the process was handled by another user, and that's what "EV" refers to.

THE COURT: Okay. How do you know this?

THE DEFENDANT: It is just -- it is just very general information in terms of, like, methodology of securing refunds online. And these are -- the two things I had mentioned there in terms of Apple and Samsung were actually information that is considered general information at that time across groups.

THE COURT: I suspect that if you asked anybody in

the room, they wouldn't know that. I don't think it is general information. I think you have to be in the business.

THE DEFENDANT: Well, when I say "general information," what I mean is in terms of the refund space. It was general information in terms of securing a refund. And so -- this was mentioned in some group that these were details that were found in other groups in which I just directed to Noir's Organization.

THE COURT: If you didn't understand how this worked and you are lying to them about your knowledge, then how is it that you have your own website where you are advertising that you can get refunds from Target, Walmart, Zappos, and Macy's? Where did you get your information on how to scam them?

THE DEFENDANT: So when it comes to that information -- as I explained earlier, when it comes to the refund process itself, it is a rather straightforward process in which you just secure account details and then get access to the label, especially with the order, and then that's passed on to someone else on Telegram for them to handle.

And then -- so in terms of -- in terms of the refund process itself, of running the service, itself, it is a very simple process of just logging into the account, gaining a label, and then that's it.

THE COURT: How do you hide the fact that you are defrauding the company from the company? How does Walmart,

Apple, Samsung not know what you are doing?

THE DEFENDANT: That part, I was not too concerned with, and I didn't -- I had no knowledge in terms of how they would know or not. Just -- I was just working off of the information that I had in terms of just making the refund work itself just by logging into an account, gaining a label, and having it passed off to someone else.

THE COURT: If you didn't actually have this knowledge and you were lying to Noir and everybody in the group about the advice you were giving and you were just parroting what you had read somewhere else, then why did you plead guilty and admit in your facts that you provided advice to Noir's Organization about the status of your own fraud project, including marketing insight about how to structure an operation? Is that not true?

THE DEFENDANT: Could you repeat that question?

THE COURT: Yeah. When you came and you pleaded guilty, you acknowledged as part of your plea agreement that you provided advice to Noir's Organization about the status of your own refund project, including marketing insight about how to structure operations. And here, you are offering advice as to what doesn't work for Apple and Samsung.

If you really didn't know how to do all of that and you were lying to them and you didn't understand how your own business worked, then why did you plead guilty? Why did you

admit to me the last time you were here that you were offering advice about how to run a refund project and giving them insight?

THE DEFENDANT: So I believe I should answer your question in two parts in terms of a time line. So when I -- when I ran my refund service, it was back in 2020, around the COVID time, around March. And that chat log in the Anime Fan Club Chat in which I mention work for Apple where I stated that I tested it, that would be found in February 4, 2022.

THE COURT: Okay.

THE DEFENDANT: So the time span is very large. And at that time, my refund service was not operational. It was already closed down.

THE COURT: Okay. That's irrelevant. What is relevant is what you were doing and how you figured it out.

How did you figure out what Apple did and didn't understand and how Apple could or couldn't track phone numbers and shut down accounts?

THE DEFENDANT: So that would be during 2022, and I just read that piece of information from another public access group, and then I diverted that information to Noir's Organization in terms of Apple.

THE COURT: And you lied to Noir and said you personally tested it.

THE DEFENDANT: Yes, that's correct. I lied about

testing it. But nonetheless, that was not a statement that I should have made at all in terms of providing any type of information in terms of Apple at all.

THE COURT: What else have you lied about in these (indicating)?

THE DEFENDANT: That was the only information that I lied about in terms of what I tested or didn't. And then the -- and that was the only -- that was the only thing that I misled the group about.

THE COURT: Okay. So on the Samsung --

THE DEFENDANT: The Samsung thing is based off of public access information that I did read in the groups.

THE COURT: But it says you have to exchange many more emails to push for a refund. How did you know that?

THE DEFENDANT: Yeah, that was actually information that was in groups --

THE COURT: So you didn't do that one either?

THE DEFENDANT: When it comes to Samsung, I did not actually do it myself. It was just information that was found in other groups, and it was public knowledge in the refund sphere in terms of what worked for Samsung because when it comes to empty-box methods, this is actually a very general thing that was known in the refund space when it comes to how the labels and stuff were handled.

And then so, like, once the label process is -- once

the label is retrieved and passed on to another person, that would be known as, like, the boxing method which they used in order to secure the refund. But in terms of -- in terms of the process of actually doing that, it would just be based off of just gaining the label itself.

THE COURT: How did you accept money when you were in the refund business?

THE DEFENDANT: When I was -- back in 2020, the way that I took the money was through -- it was through Cash App.

THE COURT: Okay. What did you do with the money once it came in?

THE DEFENDANT: Once the money came in, because I was helping -- because I was under the belief that I was helping a human-trafficking victim, what I did was I sent money to her bank account.

THE COURT: Okay. All right. Any other argument as to why what you were doing wasn't sophisticated?

THE DEFENDANT: So the platform of Telegram itself carries privacy features that is actually commonplace across social media platforms in terms of just, like -- in terms of just, like, keeping chats private or deleting messages. It is a very common thing, so it was not really -- when it comes to using Telegram, it is not an actual sophisticated means of concealing information.

THE COURT: When did you learn -- when did you learn

this, about how Telegram keeps things confidential?

THE DEFENDANT: So the way that Telegram works is that you can delete messages and it just keeps them private because you can delete messages.

THE COURT: When did you learn that?

THE DEFENDANT: Upon just using Telegram.

THE COURT: From the beginning?

THE DEFENDANT: Yes, from the beginning. And --

THE COURT: So all the way back in 2020?

THE DEFENDANT: I wouldn't -- 2020 --

THE COURT: You are using Telegram all the way back in 2020.

THE DEFENDANT: I was using Telegram back in 2020. During the initial start period, I was not using it for anything fraudulently related, just for building persona.

THE COURT: But you understood as far back as 2020 --

THE DEFENDANT: I did understand --

THE COURT: -- that Telegram could be used to delete messages?

THE DEFENDANT: Yes. I understood that it could be used to delete messages just like any other social media platform.

THE COURT: All right. I am going to overrule the objection on sophisticated means for two reasons. First of

all, that particular guideline is disjunctive, and there's two different reasons that I find that Mr. Tran fits within the sophisticated means. The first one is (10)(B) says that a substantial part of the scheme was committed from outside of the United States.

It is undisputed and the PSR says that Noir's Organization had members all over the world. Mr. Tran and Noir don't even live in the same country. Noir is located and runs Noir from Egypt. So regardless of whether Telegram is sophisticated or not, the scheme that was run by Noir was sophisticated under (10)(B) because it was an international scheme with members all over the world, including its leader.

Even if that isn't a correct reading of the guideline, and I think it is, (10)(C) is appropriate because the conspirators used sophisticated means to execute and conceal the offense. The Eleventh Circuit has said that I do look at the scheme as a whole, not just the individual's conduct, at least previously, but I am going to do both today.

The application notes give examples. One is locating a main office in one jurisdiction with operators in another.

Again, the main office for Noir was in Egypt. Operators were all over the world. The evidence shows at least 8,000 people. Many of them were here in America, including Mr. Tran himself. So under Application Note 9's

first example, he would fit within "otherwise sophisticated."

The second example is hiding assets or transactions. I am not going to find that one because I don't find that Mr. Tran was personally taking money or transactions on behalf of Noir, but I do find that there are other sophisticated means that would help conceal.

Use of proxy server and VPNs, again, Mr. Tran is saying that he didn't know -- when he first started talking, he was saying he didn't know that Telegram was used to do things privately. But there at the end of our conversation, he said he has known from the beginning that Telegram operates in a way that you can delete things and make it private and not traceable. He just said that's a form of software. But that's not what the guideline is talking about.

It is talking primarily about using means that allows the defendant to avoid detection or conceal what he or she is doing from the government. And Mr. Tran acknowledges that you can use Telegram to delete messages and thus make it easier to hide things from the government.

So even all else being the same, just the use of Telegram alone, I would find a violation or at least the enhancement under (10)(C) is appropriate. Again, I agree that Mr. Tran didn't do a lot of the things that others did. He didn't create malware. He didn't pay off insiders by calling them. He didn't create virtual credit cards, but he did act

on a private system to communicate directly with the leader of Noir's Organization, and he did know that organization was spread all over the world. So I believe that under (10)(B) and (10)(C), the two-level sophisticated means enhancement is appropriate, so I am going to add it.

Ms. Wallace, any disagreement with my application of ten-plus victims, assuming that my finding of date range is correct? Obviously, if I am wrong on that, that may be different, but there were certainly more than ten victims during the time frame of March 2020 through the summer of 2022.

MS. WALLACE: Your Honor, Mr. Tran is still wanting to explain to you that he did not use any VPNs.

THE COURT: I didn't find that he used VPNs. I find that others used VPNs to mask their IP addresses.

Mr. Hundscheid, do you have any evidence that Mr. Tran personally used VPNs?

MR. HUNDSCHEID: I would have to go back and look at the IP logs, Your Honor, so I don't want to speculate off the top of my head.

THE COURT: Do you have evidence that Mr. Tran used Telegram?

MR. HUNDSCHEID: Yes, Your Honor.

THE COURT: Do you have evidence that it is difficult, if not impossible, for the government to recover

deleted messages off of Telegram?

MR. HUNDSCHEID: Yes, Your Honor, particularly at the time that this offense conduct occurred.

THE COURT: Do you also have evidence that Noir's Organization was international in scope, headquartered in Egypt or somewhere in another country other than the United States and it had members across the United States?

MR. HUNDSCHEID: Yes, Your Honor.

THE COURT: All right. So I still find the two-level enhancement is applicable.

MS. WALLACE: And, Your Honor, I know you were asking about the ten or more victims. It would be Mr. Tran's position that there were not ten victims that he offered any advice on because I know that there was Apple and Samsung, but I can let Mr. Tran more fully --

THE COURT: Yeah, if you want to do that, that's fine. Go ahead.

THE DEFENDANT: So when it comes to my -- so when it comes to my communication with Noir, I never actually talked about any types of, like, refund methodology besides Apple and Samsung.

THE COURT: Okay.

THE DEFENDANT: And those are the only two retailers that I did speak to him about.

In terms of his refund service itself, I did not

actually pay any attention to, like, the companies that he targeted because I was not an operator, and it was just not details that I paid attention to because I -- I just -- I had no affiliation with Noir in terms of his business. I did not take any payments from it either at all. So I was not working for him. So I had no -- there was no necessary -- it was not necessary for me to actually know the full scope of, like, who he targeted in terms of, like, retailers at all.

THE COURT: But you told me earlier that you understood he was targeting retailers. You might not know which ones, but you knew what he was doing.

THE DEFENDANT: I knew what he was doing in general but not the retailers that he targeted.

THE COURT: But you would reasonably foresee he was targeting more than ten companies.

THE DEFENDANT: In terms of which retailers he --

THE COURT: I am not asking for specific names or identities.

THE DEFENDANT: Okay.

THE COURT: You knew that he was -- he was targeting more than ten companies. I mean, you personally had four or five on your own web page.

THE DEFENDANT: I did not know that he was targeting more than ten companies, no, because that is actually a very high number in terms of a refund service. It is typically --

it was typically better to just have -- just a focus on a few of them rather than just, like, a lot of them.

THE COURT: All right. I am still going to apply the ten-plus because, if you read it plainly, it applies if the offense involved ten or more victims. It doesn't say if Mr. Tran personally involved ten or more victims. It just says the offense involved ten or more victims, and the offense here is the conspiracy to commit refund fraud. And there is more than sufficient evidence in the record that the conspiracy among the Noir members involved ten or more victims.

I also find that it is reasonably foreseeable that a group as large as Noir with 8,000 members across the world would have at least ten companies that it was targeting, so I am going to add the two points there.

I am going to remove two points for zero-point offender. I find that Mr. Tran has no criminal history that results in points. I am also going to remove two points for acceptance of responsibility and an additional point for assisting the government as he accepted responsibility, which added together would be 7 plus 16 is 23 plus 2 is 25 plus 2 is 27 minus 2 is 25 minus 3 is 22.

Mr. Hundscheid, do you agree with that math?

MR. HUNDSCHEID: Yes, Your Honor.

THE COURT: Ms. Wallace, I understand what your

objections are, but objections aside, do you agree that my math is correct?

MS. WALLACE: Yes, Your Honor.

THE COURT: All right. Having overruled the objections but allowing them to be argued on appeal if Mr. Tran is allowed to appeal, I do adopt the factual statements contained in the presentence report. I make specific findings the guideline offense level is 22, the criminal history category is I. That makes the guideline prison range 41 to 51 months, supervised release period is not more than three years, and the fine range is 15,000 to 150,000 with restitution and forfeiture not being an issue.

At this time, Mr. Hundscheid, would you like to make a motion?

MR. HUNDSCHEID: Yes, Your Honor. For the reasons already stated on the record earlier in our conversation, the government would move under 5K1.1 to sentence Mr. Tram below the guidelines, specifically to depart from offense level 22 to offense level 16 which yields a new guideline range of 21 to 27 months.

THE COURT: Any objection, Ms. Wallace?

MS. WALLACE: No objection.

THE COURT: Mr. Hundscheid, same questions: Do you find that the information that Mr. Tran provided was truthful?

MR. HUNDSCHEID: Yes.

THE COURT: Mr. Jones, I need you to step out just for a second because I do need to get into some specifics.

(Courtroom cleared)

THE COURT: Do you find the information that he gave was reliable?

MR. HUNDSCHEID: Yes, Your Honor.

THE COURT: Please again describe the assistance of that information that Mr. Tran gave, particularly towards the indictment of Noir himself.

MR. HUNDSCHEID: Yes, Your Honor. At the time that the indictment was returned against Mr. Tran and the other conspirators, I would say that the Noir identification had hit a roadblock and a dead-end. All the leads had been exhausted.

Mr. Tran met with the government on multiple occasions and specifically provided two facilities that he had personally interacted with Noir on, and further process from those two facilities led to the ultimate identification and indictment of Noir.

THE COURT: Very good.

All right. I am going to grant the government's motion for a downward departure. I do find that Mr. Tran's assistance was substantial and useful. I find that the information he provided was truthful. It was reliable. It did assist the government in ultimately securing an indictment of the leader of the Noir Organization, and I do not hold it

against Mr. Tran that that has not been able to be prosecuted. That is obviously outside his control. And I do find that his assistance was timely. I am, therefore, going to grant the full six levels because, again, his assistance, above all -- I think above all of the defendants -- is the one that was able to lead to the indictment and uncovering of the identification of Noir, and, therefore, he is entitled to the greatest level reduction that I have given any of the codefendants. I think I have only given it to two. He is one, and there is another for reasons I will not get into at this time.

I find that after taking six levels off for the downward departure, the appropriate level is 16. And when you combine that with a criminal history category of I, the advisory guideline range drops to 21 to 27 months, fine range of 10,000 to 95,000, and supervised release is not more than three years.

All right. Ms. Wallace, the guideline range is now 21 to 27. I have read everything that you have submitted, but certainly if you would like to make any argument at this time, highlight any evidence, or provide any statements from any witnesses -- and then ultimately, of course, we will let Mr. Tran speak as well -- you may do so at this time.

MS. WALLACE: Your Honor, I believe all the statements we have have been submitted to the Court previously.

THE COURT: Okay.

MS. WALLACE: And I would just ask, Your Honor, that in sentencing you take into account the physical problems that I know you are aware of through the presentence report of Mr. Tran and place him accordingly if the Court is inclined to.

THE COURT: How would you like me to word that?

Do you want to go off the record for a second?

MS. WALLACE: That would probably be better, Your Honor.

THE COURT: All right. Let's go white noise, Ana.

(Sidebar discussion off the record)

THE COURT: All right. Mr. Tran, is there anything you would like to say at this time?

THE DEFENDANT: Yeah, I would like to say that -- so I -- I understand I made a mistake by affiliating myself with the wrong environment, and it was -- this has been the biggest mistake of my life, and I did not intend for things to turn out this way.

At the time, I generally felt that I was helping someone's life, and it is not -- it wasn't a situation where it was easy to say whether I was doing the right thing or not in terms of fulfilling that purpose; but nonetheless, it was a decision that I did make in terms of affiliating myself with the wrong environment, and that's exactly what I did. I have

said things I should not have, and I have -- and I have affiliated myself -- I affiliated myself with Noir and his organization when I -- when it was the complete wrong thing to do, and this has all been a situation to completely learn from and to never make the same mistake again.

And my family has fully supported me through all of this, and it is not something that I will ever repeat again. I will not allow myself to dishonor my family and to also dishonor my brother for coming here today and being there for me. And while I understand that I made mistakes, this is something that I will definitely learn from and to grow and surpass in terms of my personal life, and I just -- would just like a chance to just be -- just remain around my family and to better myself and to be a positive force for my family and the community around me.

Thank you.

THE COURT: Very good. Thank you, Mr. Tran.

Mr. Hundscheid.

MR. HUNDSCHEID: Your Honor, when -- I have had the opportunity, as you know, to meet with Mr. Tran on a couple of occasions. And in those meetings, I asked him to help me be his advocate because as the Court alluded to, there are reasons that I would want to do that. And I am grateful to him for that.

My concern, Your Honor, is that I hear a lot of

passive voice and "finding myself in situations," and I am concerned that there is no recognition of his own involvement in this. As I think was established through the Court's colloquy with Mr. Tran, his involvement is qualitatively different than other defendants, but in some ways, it is much more severe, right? If you are a super-administrator of these groups, if you are citing Noir and AIO Crime as groups that you are administrators of, that suggests your role in Noir might have been different and less involved, but your role in the fraud ecosystem is substantially bigger.

So, Your Honor, the government is going to recommend the low end of the guidelines because I believe that's sufficient but not greater than necessary in this case, the 21 months. But honestly, it is just a difficult -- a difficult decision in weighing those two dynamics.

THE COURT: Very good. Ms. Wallace, you get the last word, if anything you want to add.

MS. WALLACE: Your Honor, we would definitely ask for the low end, but Mr. Tran would like to respond to Mr. Hundscheid.

THE COURT: He may.

Go ahead, Mr. Tran.

THE DEFENDANT: I would like to clarify that my -- that my involvement with Telegram at all was because of my external factor of helping a human-trafficking victim

supposedly, and that's exactly what I did to put myself in the wrong situation.

THE COURT: Did you know -- did you know that a group called AIO Crime was committing crimes?

THE DEFENDANT: It was -- for me, it was just a general chat avenue; and while there were criminals in there, what I did, in my involvement --

THE COURT: What made them criminal?

THE DEFENDANT: I don't really necessarily know what they did to --

THE COURT: Well, you just said there were criminals in there. What did AIO Crime do that was criminal?

THE DEFENDANT: Well, just based off of their conversation in general.

THE COURT: Like what? What was the conversation about?

THE DEFENDANT: Just refunds and stuff.

THE COURT: And you knew that refunds were criminal.

THE DEFENDANT: I do know that refunding is a criminal activity, that's correct.

THE COURT: And you knew that's what Noir was doing?

THE DEFENDANT: I did know that that was what Noir was doing in terms of his organization. But in terms of my involvement in these group chats, what I did was I had casual conversations in terms of, like, current events and stuff just

to build up a persona for people to recognize me. And that was -- that was the limit of my involvement in these group chats, and I have full recognition that I should not be there or affiliated in these -- in these -- in these groups or, like -- or put myself in any sort of affiliation with fraud in the first place. That is the wrong thing to do, it is unlawful, and just completely wrong.

THE COURT: Okay. Thank you.

All right. Although I have the authority to depart or vary from the application of the guidelines, I don't find a reason to here.

I will be blunt, Mr. Tran, as to what Mr. Hundscheid was trying to say. You are the fourth defendant I have had today, and the other three came in here and just very bluntly said, What I did was a crime. I admit I did it. I knew I did it.

And no matter what question I asked you, you always tried to find a way to minimize or say that what you were doing wasn't a crime. I mean, I have got direct statements from you -- hold on -- that Apple has a system in place that if they detect a number of problems from the same number, they would be linked and inclined to fail.

How did you figure that out?

I know because I tested it across a few months, alternating between numbers.

And you come in here, Oh, I was lying. And then you do this with Samsung, and you tell me that you are lying and that you are running a refund fraud service but you don't really know that other refund frauders are committing crimes.

At no point in the two times I have had you have you just been able to just stand up and bluntly say: I knew what I was doing was criminal. I knew what Noir was doing was criminal. These were crimes, and I was helping him think about how to better commit crimes.

Instead, you have come up with excuses and statements that I wasn't really committing a crime. I was lying or puffing myself up because I was in a group chat.

Why can't you just bluntly say that in 2020, I was committing crimes, and I knew Noir was committing crimes. And I was helping him commit crimes. And when I was telling him what Apple had understood and what Samsung understood, I was able to tell him that because I was still doing it, and I was giving him advice on how to do it better.

THE DEFENDANT: May I respond?

THE COURT: You may.

THE DEFENDANT: So in 2020 -- around the beginning of March of 2020, it was certainly the case that I was doing refunds myself because I ran a refund service. There is no denying that.

And in terms of my relationship to Noir, I was

trying to explain how the chat logs went, but I have -- I have full recognition that I should not be saying anything related to that, especially because I had my own refund service; and therefore, I -- there was no reason for me to be in Noir's groups in the first place. And despite the fact that I was dropped into these groups and despite the fact that I could not properly leave, I still should not have engaged at all. And I have full recognition of this.

THE COURT: I don't understand why you couldn't leave. If you know the Noir Organization is an international crime organization and you know what they are doing is criminal, why can't you just literally delete your Telegram account or not respond when they are asking for your advice. Who forced you to stay? This was two years later.

THE DEFENDANT: So in terms of the way that -- so this would be based off of my dynamic with Noir himself; and because we had a more personal relationship, he thought it was just fun to just drop me in the groups repeatedly. And so as shown in the previous exhibit, he just did it for fun and just to irritate me. And so at some point, it was just -- it was just not -- it was just -- there was just no point of actually physically -- or not physically -- just, like, there was just no point of leaving the group itself because he would just add me back.

THE COURT: He was annoying you, and you continued

on? I don't understand why you would do that.

THE DEFENDANT: Yeah, it was just part of Noir's crux as his personality. He would just do things for fun because we had a personal relationship that was based off of actual friendship.

THE COURT: Why would you lie about knowing how Apple detects problems and say that you tested it across a few months? If you didn't like being involved in the group chat at all, why would you come up with a lie to help them better understand how to deal with Apple?

THE DEFENDANT: Yeah, that was a -- very poor decision-making on my part.

THE COURT: Why would you do it, though?

THE DEFENDANT: In terms of -- in terms of why I did it, it was just to, like, remain in the group, just to --

THE COURT: But you just told me you didn't want to be in the group.

THE DEFENDANT: I did not want to be in the group. However, at that time, I thought it was best to observe what else they would say while not having any affiliation with them. And as mentioned already, I completely understand that this was the wrong thing to do. I should not be putting myself in any type of situation related to fraud or anything that's related to breaking the law in general. I understand this completely, and I understand completely that I was doing

the wrong thing.

THE COURT: Okay. All right. For the same reasons, I find that the low end of the guideline is appropriate. Again, that is what the bargain between Mr. Tran and the government was, and I will respect that.

Also, this reflects, again, the most significant discount I have given anybody, not only in this case but in any of my cases, in going down six levels out of respect for Mr. Tran's assistance to the government and helping determine who Mr. Noir ultimately was and leading to his indictment.

So I do find that a sentence of 21 months is appropriate having considered the guideline computations and the factors found at 18 U.S.C. 3553(a).

I am going to recommend that the bureau sit down with Mr. Tran, let him go through a medical assessment, and determine where the best placement for him is. I find that Mr. Tran could be susceptible -- I am just worried about his placement within the Bureau, and I know that Ms. Wallace has expressed that as well. And I want them, between the time of now and when he's ultimately placed and turns himself in, for them to strongly consider where the best, for health and protection reasons, location for him is.

For that reason, Mr. Tran, I am not going to make you turn yourself in today. I am going to -- I am going to set it off at least two months for the Bureau to make that

determination.

I find that this sentence, again, is reasonable in light of the factors under 3553(a).

I am not going to impose a fine because I find Mr. Tran could not pay it at the present time. There is no restitution, no forfeiture, but I am going to order a $100 special fee. It is mandatory by statute, and it must be paid immediately.

Upon your release from prison, you will be placed on supervised release for three years. While you are on supervised release, you will comply with the standard conditions of release of record in this court and the following special conditions.

You will cooperate in the collection of DNA evidence under the administrative supervision of your probation officer, and you will participate in a mental health treatment program under the administrative supervision of your probation officer and follow any rules and requirements of the program.

You will contribute to the cost of any treatments given to you by probation unless they determine that you cannot pay for it.

I will not impose the computer monitoring program, Mr. Tran. That means that once you are done with your prison sentence, I am not going to have probation or the government monitor your computer, but that's with the understanding that

if you go back to committing online fraud or any type of fraud using a computer or phone, that would result in the immediate revocation of your release and your return to incarceration, understood?

THE DEFENDANT: Yes.

THE COURT: Okay. In imposing this length of supervised release and considering the factors found at 18 U.S.C. 3583(c) and 3553(a), I find that it is reasonable under those factors.

Mr. Hundscheid, any objection as to my findings of fact, the calculation of the guideline range, the sentence I imposed or the manner in which I imposed it?

MR. HUNDSCHEID: No, Your Honor.

THE COURT: Ms. Wallace, other than the objections to the calculation of the offense level that we have already gone over, any objection to anything that we have done today?

MS. WALLACE: No, Your Honor.

THE COURT: All right. Mr. Tran, you do have the right to appeal this sentence within 14 days if you think it violates the law. You may have waived that right as part of your plea agreement. Generally, our circuit does enforce those waivers. In other words, typically, they could say you can't appeal because of the waiver. That said, you can always make an argument to them why they shouldn't enforce it and why they should allow your appeal. The most important thing is if

you do want to appeal, do it within 14 days because if you miss that 14-day window, you have waived your right to appeal.

Understand?

THE DEFENDANT: I understand.

THE COURT: All right. So if you can't pay the cost of appeal but want to, you can apply to appeal in forma pauperis and ask that Court to give you an attorney. If they do that, they can -- you can then ask them to prepare and file your notice.

Now, as for a turn-in date, like I said, I am going to set it off until Monday, June the 8th. That's just a little under two months from now, and that will be at noon local time.

Again, the Bureau will work with you to determine where the appropriate location is. You will not have to come back here. It will be wherever they tell you.

Ms. Wallace, if Mr. Tran has any issues between now and then that warrants a different date or the Bureau lets me know that it needs to change, I will obviously do whatever I can to make that transition easier.

Understood?

MS. WALLACE: Yes, Your Honor. Thank you.

THE COURT: All right. Anything else from Mr. Tran today?

Anything else?

THE DEFENDANT: I don't really have anything else to add other than the fact that I -- I certainly did accept responsibility in this case, and that's something that I did try to communicate. I am not the most verbal person, and I am a bit antisocial, and my communication with you is a bit limited in that aspect. But I did my best to communicate the fact that I did accept responsibility, and I do know with full knowledge that I did the wrong things, and these are mistakes that I am not going to ever repeat again.

THE COURT: Thank you, Mr. Tran. I don't hold your ability to communicate against you. In fact, as far as being prepared as a defendant to argue your case, you are probably top ten percent of anybody I have had. You communicate very well.

And, again, the sentence you have gotten is at the bottom end of a very low guideline because of the assistance you have given the government. So, you know, it is not like I am holding anything against you. My comment was -- and I think Mr. Hundscheid shares it -- is there's just never been a full-throated: I acknowledge that I was committing crimes personally, and I acknowledge that I was helping Noir commit crimes. And I knew that's what was going on.

It has always been a deflection or a "I was lying" or "I didn't want to be part of the group." It has never just been looking at me and saying, Your Honor, I admit I was a

criminal, I admit Noir was a criminal, and I admit that I was helping him be a criminal.

That is my point.

THE DEFENDANT: May respond to this?

THE COURT: You may.

THE DEFENDANT: Yes. So when it comes to my own refund service, it is undeniable that I participated in criminal activity. There's no denying that. And the way that I was trying to explain my relationship with Noir, it has always been a rather particular relationship that I had with him, and that's why the details are a bit nuanced and hard to really fully explain in detail.

But in terms of -- in terms of me saying that I lied when it comes to the Apple methodology, it is not a case that I did lie because I sourced that information from other groups. And it is -- I have full knowledge that this was something that I should not have done at all --

THE COURT: Mr. Tran, I am going read for you word for word what you said. "I know this because I have tested it across a few months, alternating between numbers."

"I tested it." It is not others tested it, posted it on a forum --

THE DEFENDANT: Yes.

THE COURT: -- I read it, and I am telling you what they said. You said, "I tested it across a few months,

alternating between numbers." You specifically said: I was the one doing it; this is how I get personal knowledge.

THE DEFENDANT: Yes.

THE COURT: So that's not me misreading it. That is -- that is what you said.

THE DEFENDANT: You did not misread it. It was something that I did say by taking information from other groups and misappropriating it to Noir's group.

THE COURT: Okay.

THE DEFENDANT: Because I was an admin of many groups, it was just the case I had access to many groups, so it was easy for me to source information from just -- just in general. And so I misappropriated that to myself when I should not have, and the very fact that I said it at all was a complete wrongdoing. I should not have been in the group at all, and I have full recognition that I should have left. I did try, but I was added back. And the reason why I did not leave Telegram, itself, is because I was just focused on my stock channel.

After the fact that -- after the fact that I found out I was being lied to, that's when I ended my refund service, and that's when I focused on my stock group. And that's why I remained on Telegram, itself, despite having no affiliation to actually conducting fraud myself.

THE COURT: Okay.

All right. Ms. Wallace, anything else?

MS. WALLACE: No, Your Honor. Thank you.

THE COURT: All right. We are adjourned. Thank you.

(Proceedings adjourned at 3:44 p.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript to the best of my ability from the record of proceedings in the above-entitled matter.

So certified on this date, April 30, 2026.

Carrie M. Robinson, RMR, CRR, CRI
Federal Official Court Reporter

Respectfully submitted,

*/s/ Lisa M. Ivey*
Lisa M. Ivey (asb-2264-a36i)
Attorney for Defendant-Appellant

***OF COUNSEL:***
**STUBBS, SILLS & FRYE P.C.**
1724 South Quintard Avenue
Post Office Box 2023
Anniston, Alabama 36202
(256) 835-5050
lisa@stubbssillsfrye.com

## CERTIFICATE OF SERVICE

I certify that on September 23, 2026, the Appendix was filed electronically using this Court's CM/ECF system, which will provide notice of filing to all counsel of record.

*/s/ Lisa M. Ivey*
Lisa M. Ivey (asb-2264-a36i)T